**In re CENTRAL ICE CREAM COMPANY, Debtor.**

**Bankruptcy No. 78 B 4820.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Oct. 9, 1985.

Memorandum as to Expenses Requested
By Special Litigation Counsel
Jan. 23, 1986.

Theodore M. Becker, J. Samuel Tenenbaum, Chicago, Ill., Gerry L. Spence, Jackson, Wyo., for Central Ice Cream Co.

James E. Carmel, Karen Goodman, Chicago, Ill., for Trustee.

Adelman & Gettleman, Chicago, Ill., for Unsecured Creditors' Committee.

Nicholas Manos, George Karcazes, Chicago, Ill., for Rafael & Kamberos.

Arnold Pagniucci, Chicago, Ill., for Cummings & Stellings.

Donald E. Puchalski, Chicago, Ill., for Teamsters Local Union 717.

Jerome Rotenberg, Chicago, Ill., for Izdebski.

Salvatore A. Barbatano, Chicago, Ill., for Jann, Carroll, Kruse & Sain Investment.

Eugene Crane, Chicago, Ill., for Cotton.

Frederic S. Lane, Chicago, Ill., for McDonald's Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This cause came on for hearing on the "Trustee's Application for Approval of Amended Settlement Agreement and for Authorization of Payment of Attorneys' Fees and Litigation Expenses" as further amended October 2, 1985, (the "Trustee's Application"). The issue was whether this Court should approve the settlement offered by McDonalds of the claims and judgment for $52,000,000 won against it by debtor in a case long pending in the Circuit Court of Cook County. That offer by McDonald's as finally amended was for $15,-500,000 plus interest at the rate of 8% per annum from the date of approval by this Court until paid. This Court considered pleadings and briefs filed by the Trustee, creditors, parties in interest and other persons claiming to be shareholders[1]. The Court also considered sworn testimony and exhibits entered into evidence, and the arguments of counsel for the debtor and the aforementioned parties and persons. The foregoing was considered in light of the applicable standards for evaluation of proposed settlements under the Bankruptcy Act of 1898 as amended, 11 U.S.C. § 50 (the "Act") under which this case was filed, and standards required by authority. Having made an informed and independent evaluation of all factors relevant to a full and fair assessment of the proposed compromise, and being fully advised in the premises, the Court entered its preliminary Memorandum Opinion September 20, 1985, and on October 2, 1985 entered orders approving the settlement and other orders pertinent thereto.[2] The Memorandum Opinion of September 20, 1985 is adopted herein by this reference, and the Court now makes and enters the following Findings of Fact and Conclusions of Law setting forth in further detail the reasons for approval of the settlement.

## FINDINGS OF FACT

1. During the period 1971 through 1974, the Debtor, Central Ice Cream Company ("Central") did business with McDonald's Corporation and McDonald's System, Inc. ("McDonald's"). At McDonald's request, Central developed, manufactured and supplied a three-flavor, slow-dripping, factory-filled and packaged ice cream cone known as "Tripple Ripple" for sale in McDonald's outlets nationwide. In late 1974, McDonald's ceased purchasing Tripple Ripple from Central. Central contends that McDonald's thereby breached agreements with Central for long term purchase of Tripple Ripple, which agreements arose out

1. The Court permitted persons who claim an equity interest in the Debtor to file pleadings and briefs, offer evidence and be heard, and considered all arguments, relevant evidence, and briefs offered by such persons. The Court did so without in any way determining or ruling on their claims to stock ownership or standing, which standing was challenged by the Trustee.

2. Order Approving Settlement; Order that McDonald's has Subjected Itself to Jurisdiction of This Court; Order Rejecting Original Settlement Offer and Agreement of June 20, 1985; Order Not to Appear to Vacate State Court Judgment Except on Order of this Court; Order as to Attorneys Fees; Order for Repayment of Loans; Order as to Expenses.

of a handshake agreement with McDonald's now deceased founder Ray Kroc, and which were corroborated by internal McDonald's documents.

2. Through its Chairman of the Board and President Thomas N. Cummings, Central retained Theodore M. Becker and the law firm of Becker & Tenenbaum to prosecute or settle all claims and causes of action against McDonald's that related to Tripple Ripple. On July 21, 1976, a written Retainer Agreement was entered into between Central, Cummings, and said attorneys, which provided in pertinent part:

In consideration for service rendered and to be rendered by Attorneys, Clients agree to pay Attorneys, ... after the filing of a lawsuit, Forty Percent (40%) of all monies and sums recovered by suit, settlement or otherwise.

\* \* \* \* \* \*

It is further understood that all costs, expenses, filing fees and all other expenses will be paid by Clients and will come out of their share of recovery. Such costs and expenses will be billed to Clients by Attorneys for payment by Clients as said bills are received.

\* \* \* \* \* \*

Clients hereby grant Attorneys a lien on their cause or causes of action described in general terms herein.

Exhibit A to "Trustee's Application for Approval of Compromise and Settlement and for Authorization of Payment of Attorneys' Fees and Expenses," filed June 28, 1985; adopted by reference in the Trustee's Amended Application.

3. During the latter half of 1976 and most of 1977, Becker and Cummings attempted to obtain a settlement from McDonald's prior to filing suit. At Cummings' direction, Becker demanded from McDonald's the sum of $600,000 in full settlement of any and all claims by Central against McDonald's, its distributors, licensees, etc. McDonald's rejected the demand and made no counteroffer.

4. On November 14, 1977, Central filed suit No. 77 L 22117 in the Circuit court of Cook County, Illinois against McDonald's (the "Lawsuit") seeking actual damages in the amount of $18,328,552.29, punitive damages in the amount of $5,000,000, costs of suit and attorneys' fees.

5. Central filed a Petition under Chapter XI of the Bankruptcy Act on June 26, 1978. Pursuant to Order entered on September 1, 1978, after an evidentiary hearing, Central (as Debtor-in-Possession) was authorized by the Bankruptcy Court to retain Theodore M. Becker and the law firm of Becker & Tenenbaum ("Special Litigation Counsel") for the purposes of continuing the representation of Central in the further prosecution of the Lawsuit. Said Order approved and affirmed the Retainer Agreement providing for the payment of fees and expenses in connection with said litigation.

6. On February 1, 1979, McDonald's filed a counterclaim against Central for negligent and fraudulent misrepresentation involving technical issues concerning the manufacture, storage and delivery of ice cream. Special Litigation Counsel proceeded to defend the counterclaim.

7. Central was adjudicated a bankrupt on April 29, 1980. Bernard C. Chaitman is the duly appointed, qualified and acting Trustee of Central. Pursuant to Order entered on December 10, 1980, the Trustee was authorized by the Bankruptcy Court to continue the retention of Special Litigation Counsel upon the same terms and conditions as set forth in the Order of September 1, 1978 and the Retainer Agreement.

8. During the past nine years, no one, except McDonald's at one juncture, objected to the fact that Special Litigation Counsel was representing Cummings and his family in matters not in the suit with McDonald's as well as Central and the Trustee in the Lawsuit. In early 1981, McDonald's filed in the Circuit Court a motion to disqualify Special Litigation Counsel. That motion was denied after Special Litigation Counsel obtained an Acknowledgment and Consent to representation that was signed by the Trustee, Cummings and members of the Cummings family, GSK Corporation, George S. Kamberos and others. (Court

Exhibit 7). However nothing therein authorized any Special Litigation Counsel to represent Cummings or his family or anyone else at any point where their interests conflicted with the interests of the Trustee or Central in the litigation with McDonald's. Nor did the Bankruptcy court ever authorize any such acts by any counsel in conflict with the interests of this estate.

9. It was to the advantage of the creditors and other parties in interest to have Thomas Cummings assist and work very closely with Special Litigation Counsel during the many years of litigation. On behalf of Central, Cummings had made the agreement with Ray Kroc, who had acted on behalf of McDonald's. Cummings attended the meetings at which McDonald's made its promises and representations; traveled around the country visiting McDonald's distributors and outlets; and had first-hand knowledge of the development and manufacture of Tripple Ripple. In order for Central and the Trustee to present an effective case, it was necessary for Cummings to interpret for Special Litigation Counsel the myriad of documents and records of Central. Throughout the years that the Lawsuit has been pending, Cummings assisted in the preparation of the Lawsuit. At trial, Cummings was Central's representative and testified as the plaintiffs' chief witness.

10. In 1982, Central and the Trustee, through Special Litigation Counsel, demanded from McDonald's $10,000,000 in settlement of the Lawsuit and were prepared to accept much less. McDonald's rejected the demand and made no counteroffer.

11. Pursuant to Order entered in Bankruptcy Court on February 9, 1983, the Trustee was authorized by the Bankruptcy Court to retain Gerry L. Spence, Edward P. Moriarity and the law firm of Spence, Moriarity & Schuster ("Additional Special Litigation Counsel") in connection with the Lawsuit, to share in contingent fees previously approved, upon the same terms and conditions as set forth in the Orders of September 1, 1978 and December 10, 1980.

12. The prosecution of the Lawsuit and the defense of the counterclaim over the years entailed substantial and intense motion practice and discovery. Special Litigation Counsel were required to expend a great deal of effort in connection therewith which had not been contemplated when the Lawsuit was filed, such as the development of food science and technical expert testimony which involved the taking and defending of depositions of each party's food science and technology experts. The suit could not possibly have been maintained out of estate assets alone. It was necessary to borrow to date a total of $531,105.21 from parties who would only agree to loan those sums at steep annual interest rates, which loans were approved by the Bankruptcy Court. Those moneys were urgently needed from year to year for necessary litigation expenses.

13. All Special Litigation Counsel devoted over 45,000 hours of work in connection with the marshalling, production, inspection and analysis of over 500,000 documents; preparation of thousands of pages of pleadings, correspondence, motions, memoranda and other materials; 40 depositions taken in connection with the Lawsuit; consultation with experts in the area of food sciences and technology who testified at depositions; meetings with accountants who consulted with Special Litigation Counsel, compiled Central's damages and testified at deposition and at trial; preparation of audiovisual materials for trial; computerization of deposition testimony and documents for retrieval; investigation; witness preparation; document storage and handling; paralegal/technical support; trial; and a multitude of other necessary items and activities.

14. Shortly before trial, McDonald's voluntarily dismissed its counterclaim. From time to time prior to and during trial, Central amended its complaint to add the Trustee as a party-plaintiff, to add counts and causes of action, and to seek additional damages. Ultimately, Central and the Trustee sought $179,986,123 in damages from McDonald's.

15. The trial of the Lawsuit before a jury commenced on October 24, 1983 in the Circuit Court of Cook County. Prior to trial and during the first half of the trial, Spence attempted to obtain an offer of settlement from McDonald's by discussing with McDonald's attorneys and officers figures ranging from $4,000,000 to $8,000,000. McDonald's refused to make any offer of settlement.

16. The trial of the Lawsuit was complex and lengthy, lasting 13 weeks, and was reported to be the longest civil jury trial in the history of Cook County. The trial involved 28 witnesses (including expert witnesses), thousands of pages of documentary evidence, hundreds of thousands of pages of discovery documents, books and records. Three attorneys tried the Lawsuit on behalf of Central and the Trustee. Over a dozen support personnel devoted all or a significant portion of their working hours, plus overtime, to the trial of the Lawsuit on behalf of Central and the Trustee. From time to time during the course of the trial, total staffing on behalf of Central and the Trustee involved substantial effort by more than 20 persons.

17. During the trial, the Circuit Court made various rulings striking certain of Central's causes of action and striking Central's claim for punitive damages. On January 20, 1984, the jury rendered a verdict in favor of Central and against McDonald's on two counts (breach of contract and fraud) of Central's Second Amended Complaint, in the amount of $52,000,000. Judgment was entered on that verdict.

18. During the Spring of 1984, Spence had discussion with Fred Turner, McDonald's Chairman-of-the-Board and chief executive officer, in which Spence attempted to obtain from McDonald's an offer of $25,000,000 in settlement of the Lawsuit. McDonald's made no offer at that time.

19. On June 15, 1984, McDonald's filed a 44-page post-trial motion with a 192-page supporting memorandum. Court Exhibit 1. On January 4, 1985, Central filed a 673-page response to McDonald's post-trial motion. Court Exhibits 2–5. On March 22, 1985, McDonald's filed a 138-page reply.

Court Exhibit 6. A full day hearing and oral argument on McDonald's post-trial motion took place on May 17, 1985, Court Exhibit 101, and the Circuit Court set the date of June 21, 1985 for ruling on McDonald's post-trial motion.

20. On June 14, 1985, only one week prior to the scheduled ruling date, settlement negotiations were initiated by McDonald's Chairman Turner by way of a telephone call to Spence. Subsequent settlement discussions were carried on under extreme time pressure because of Turner's insistence that they be concluded prior to the scheduled ruling by the Circuit Court on McDonald's post-trial motion. The negotiations were initially carried on, at Turner's insistence, only between Turner and Spence via telephone over the ensuing weekend. Turner initially offered Central and the Trustee a sum not specifically recalled by Spence, in the range of about $11,000,000. Later $15,000,000 was offered, which Spence rejected.

21. On Monday morning, June 17, Turner offered Central and the Trustee what he represented to be his top offer ("not one penny more") of $15,499,999.99 (hereafter $15.5 million), subject to approval of McDonald's Board of Directors. Later that day, McDonald's Board granted Turner authority to make the offer. Spence informed Becker of the settlement offer, and Becker informed the Trustee's independent counsel, James E. Carmel. McDonald's was asked to put its offer in writing.

22. On Tuesday, June 18, at around noon, McDonald's counsel delivered to the office of Becker & Tenenbaum a draft "Settlement Agreement," attaching as exhibits a proposed Stipulation, two proposed Orders to be entered by the Circuit Court, and a form of Mutual Release required by McDonald's. This first draft was prepared by McDonald's attorneys as were all subsequent drafts and versions of the "Settlement Agreement." The first draft was immediately transmitted by Becker to the Trustee, care of Carmel. (Court Exhibit 8.)

23. The first draft Settlement Agreement required the sealing of the Circuit Court's ruling on McDonald's post-trial mo-

tion, and also required not only the signature of Cummings as President of Central but also the execution of a personal release by Cummings of any and all claims he individually had against McDonald's. Cummings, the President of Central and Central's representative and principal witness at the trial of the Lawsuit, was never a party to the Lawsuit and his signature is not necessary for a release of Central's claims against McDonald's. Cummings refused to sign the first draft Settlement Agreement or to execute the requested personal release. Cummings stated that he would sign a release personally only if he were separately compensated for personal claims he was prepared to assert but never had sued on against McDonald's. Becker reported Cummings' position to Carmel, and Spence reported Cummings' position to McDonald's attorneys.

24. The Trustee, through Carmel, advised Becker that it was inappropriate for the Trustee to enter into the first draft Settlement Agreement because it provided for deposit of funds with the Clerk of the Bankruptcy Court without any indication as to the manner in which the funds were to be allocated.

25. McDonald's then took the position that unless settlement documents were signed by Thursday, June 20, and the Circuit Court's ruling was sealed, McDonald's offer of settlement would be withdrawn and no further offer would be made, irrespective of the outcome of the Circuit Court's ruling on McDonald's post-trial motion. On June 19, 1985, Spence relayed to Mr. Horwitz, a high officer and attorney of McDonald's (who was in control of the negotiations while Mr. Turner was out of the country) Cummings' request for a personal payment to himself in return for the requested personal release. The initial reaction of that McDonald's official was that he would take the $15.5 million offer directly to this Court and drop the request for the Cummings release. Spence did not pursue that possibility but talked the McDonald's officers out of tendering the full $15.5 million offer to the estate without Cummings'

release being required.[3] Spence then engaged in discussions with Cummings and McDonald's attorneys to determine the amount Cummings would accept for the release of his personal claims and whether McDonald's would offer a sum acceptable to Cummings. Spence negotiated for McDonald's to pay $4 million to Cummings out of the $15.5 million offered, thus reducing the amount offered to Central and the Trustee to $11.5 million. The remaining Special Litigation Counsel did not disapprove and by their conduct later ratified Spence's actions as aforesaid.

26. On Thursday morning, June 20, 1985, McDonald's attorneys transmitted to Becker a second draft Settlement Agreement and related documents, providing for payment of $11.5 million in settlement of the Lawsuit, and $4 million to Cummings and his wife in settlement of Cummings' unspecified individual claims. Of Cummings' $4 million, $1.6 million (or 40%) constituted attorneys' fees; thus, the total fees sought by Litigation Counsel were not to be changed because Cummings was to share in the settlement. (Court Exhibit 9.) Certain revisions which did not affect the economic terms were made on an ongoing basis up until late Thursday afternoon, June 20, when the Settlement Agreement was executed in the form that was attached as Exhibit D to the original "Trustee's Application for Approval of Compromise and Settlement and for Authorization of Payment of Attorneys' Fees and Litigation Expenses" (the "Trustee's First Application"), which was presented to the Court on June 28, 1985. The Settlement Agreement was conditioned on approval by this Court, and the Trustee entered into the Settlement Agreement subject to the approval of the Bankruptcy Court so that the same could be presented here for consideration.

27. Special Litigation Counsel and Additional Special Litigation Counsel informed the Trustee, through his independent counsel, of all progress and developments in the settlement discussions. There is evidence that the Trustee approved of all actions taken, though without any application be-

3. Spence testimony, September 9, 1985, Tr. 68–75.

ing made to this Court by either Trustee or Special Litigation Counsel for instructions or approval of the negotiating terms offered and solicited, or as to the demand for release from Cummings and his response thereto.

28. Notice of a July 9, 1985 hearing on the Trustee's First Application was sent to creditors and certain other parties. Said notice provided that any objection to the relief sought in the Trustee's First Application be filed in writing by July 8, 1985.

29. Five responses were filed to the Trustee's First Application as follows:

i) Richard Izdebski, who claims an equity interest in Central, challenged the Cummings' separate settlement;

ii) Ben D. Cotton, who claims an equity interest in Central, requested the Court to accept the offer but to postpone distribution of the settlement proceeds until Cotton's claims were determined;

iii) Rico G. Paone, Jann, Carroll, Kruse & Sain Investment Partnership and its partners, Irwin Jann, Howard Carroll, Richard Kruse and Kenneth Sain, individually (the "Paone Group"), who claim an equity interest in Central, challenged the Cummings' separate settlement; challenged the attorneys' fees; challenged the January 17, 1981 Agreement between the Trustee and Kamberos; requested that the Trustee pay only the principal amount of administrative claims without interest; requested that the Trustee pay only the principal amount of general and unsecured claims; challenged certain expenses reimbursements; and challenged the creditor claims of Cummings and his relatives;

iv) George A. Rafel and George S. Kamberos ("Rafel/Kamberos"), who claim an equity interest in Central, objected to the sufficiency of the settlement amount and to the Cummings' separate settlement;

v) The Teamsters Local Union 717, a creditor, challenged the Cummings separate settlement but indicated that if the Settlement Agreement had to be approved as is or rejected, that it should be approved.

30. The Court commenced the hearing on July 9, 1985 by Court examination of Becker as to the events leading up to the then pending offer. Among other things, Becker testified concerning the general nature of the Cummings' possible personal claims against McDonald's, but testified that he was under State Court Order not to disclose one of those claims, a State Court transcript pertaining to which having been impounded. Pursuant to this Court's Order, Becker then agreed to provide a further explanation of Cummings' personal claims to the Court *in camera.* Because of subsequent events, this Court has not examined the submission then filed by Becker under seal *in camera.*

31. On July 10, 1985, McDonald's, by one of its authorized attorneys Fred Lane, appeared voluntarily and without invitation in open Court. To avoid the possible necessity of disclosure of the Cummings' personal claims, Lane then offered on behalf of McDonald's by letter addressed to the Court (Court Exhibit 106) to pay the full sum of $15.5 million to the Trustee in settlement of the Lawsuit, without requiring Cummings' personal release or any payment to Cummings. Thereafter, the Trustee received an Amended Settlement Agreement drafted by McDonald's, providing for payment of the settlement sum of $15.5 million to the Trustee, and without requiring the signature or personal release of Cummings. On July 23, 1985, the Trustee presented the Trustee's Pending Application to the Court.

32. Notice of an August 8, 1985 hearing on the Trustee's Pending Application was sent to creditors and certain other parties. Said notice provided that any objection to the relief sought in the Trustee's Pending Application be filed in writing by August 2, 1985.

33. Three responses were filed to the Trustee's Pending Application, as follows:

A) The Paone Group requested the Court to accept the $15.5 million offer only if certain of the Paone Group's own terms and conditions were met, including:

1) conditioning approval of the settlement offer upon McDonald's paying the settlement sum into the Estate or upon McDonald's agreeing to pay interest on the settlement sum; and

2) deferring any disbursement of the settlement proceeds, including the proposed disbursements which are the subject of the Trustee's Pending Application.

B) Rafel/Kamberos objected to the sufficiency of the $15.5 million offer and the manner in which settlement negotiations were conducted.

C) Thomas Cummings, Barbara Cummings, Leon Stellings and Tina Stellings, the majority shareholders of Central, objected to the sufficiency of the $15.5 million offer.

34. The Trustee and his counsel now have made full and complete disclosure to this Court, the creditors of this Estate and other parties claiming an interest, of all facts and circumstances surrounding McDonald's settlement offers. The court over many weeks heard testimony and considered evidence from all proponents and objectors, indeed from any party who sought to offer views or evidence. No relevant evidence was excluded, and all parties rested.

35. McDonald's is not presently willing and has never offered to pay more than $15.5 million in settlement of the Lawsuit. In the course of this hearing, its Amended offer was improved by an offer of interest thereon from date of approval by this Court, after this Court indicated intent to reject the settlement unless the estate was protected by interest pending any lengthy appeals herein. But no further improvement of that offer can be foreseen. It is difficult, if not impossible, to predict the likelihood that the $52 million judgment will be upheld not only in the trial court but also on appeal. In its post-trial motion, McDonald's raised a myriad of challenges to the jury verdict. Although the Circuit Court has completed its ruling, the outcome is unknown to the parties to the Lawsuit and their attorneys. As a condition of

its settlement offer, McDonald's required that the Circuit Court's ruling on McDonald's post-trial motion be sealed and that has been done by that Court. If the Circuit Court has ruled in favor of McDonald's on certain issues raised in McDonald's post-trial motion, a judgment notwithstanding the verdict could be entered in favor of McDonald's on either the contract or fraud Counts, or on both Counts. Other issues raised in McDonald's post-trial motion could lead to the grant of a new trial and/or entry of a remittitur. While this Court makes no finding on the merits of any issue raised in McDonald's post-trial motion, this Court does find a substantial likelihood that plaintiffs would prevail on that motion were the ruling of the Circuit Court unsealed.

36. Even if the Circuit Court has denied McDonald's post-trial motion in its entirety, the reviewing process affords McDonald's further opportunities to obtain relief from the judgment. McDonald's can pursue an appeal-of-right to the Illinois Appellate Court. Furthermore, even if the judgment is affirmed in all respects by the Illinois Appellate Court, McDonald's can petition to the Illinois Supreme Court for leave to appeal. If the Illinois Supreme Court denies leave to appeal, or grants leave and affirms the judgment on appeal, McDonald's can petition the United States Supreme Court for a Writ of Certiorari. At each stage, complex issues would be presented which, in view of the substantial verdict, would receive extraordinary appellate scrutiny. No one can with confidence predict the result of that process.

37. Even if Central and the Trustee prevail at each stage of the post-trial reviewing process, it can reasonably be anticipated that the process will consume a minimum of two years and possibly much longer. If the Circuit Court has granted McDonald's any relief in its ruling on McDonald's post-trial motion, it may be necessary for Central and the Trustee to appeal, and this would further prolong the reviewing process.

38. In the event a new trial is ordered, Central and the Trustee would be faced

with another monumental undertaking. Because of the nature of the case, the new trial might differ considerably from the first trial. There is a possibility that Cummings would not be available to testify at a new trial, and such unavailability would impair the chances that Central and the Trustee would again succeed on the merits. There is little doubt that a new trial would be lengthy and therefore would involve the risk that a mistrial would occur due to illness or other circumstances affecting the availability of jurors, the trial judge, or counsel. Mr. Becker testified that any substantial failure by plaintiffs during the many years of battle toward trial and judgment would have doomed the effort. No one could foretell with certainty the outcome of a reversal now with need for retrial. While optimistic about the future should the litigation continue, Special Litigation Counsel recommend the settlement.

39. The Trustee's best estimate, based upon his preliminary review of the schedules, claims docket and proofs of claim, is that after payment of attorneys' fees and litigation expenses, the net settlement proceeds will permit payment in full of all allowable administrative expenses, Debtor-In-Possession obligations and unsecured pre-petition claims as may be allowed by this Court even with interest, and will likely result in a surplus for stockholders in the range of at least $1 million (Trustee Exhibit 101).[4] That would be a better result than any prior bankruptcy in this District has achieved, according to the Trustee's testimony from his experience. In view of the substantial benefit of the present offer to Central's Estate, the risk of continuing the litigation in the hope of enhancing the ultimate recovery is too great. There is no assurance that there will be sufficient funds available to the Estate in the event of a reversal and a new trial. While one party offered an irrevocable Letter of Credit to back his offer to finance further litigation up to costs of $300,000, no assurance or indemnification have been provided to protect the Estate

against the possibility of a recovery less than the amount of the present settlement offer. Moreover, the expense, inconvenience and delay inherent in continuing this litigation mitigate against rejection of the settlement offer.

40. Upon payment by McDonald's of the full settlement ($15.5 million plus interest thereon at 8% per annum from the date of approval by this Court on October 2, 1985, until paid), Theodore M. Becker and the law firm of Becker & Tenenbaum, as Special Litigation Counsel, and Gerry L. Spence, Edward P. Moriarity and the law firm of Spence, Moriarity & Schuster, as Additional Special Litigation Counsel, will then be entitled to attorneys' fees in an amount equal to 40 percent of the settlement proceeds paid by McDonald's. Said obligation for the payment of said attorneys' fees exists by reason of the terms and conditions of the Retainer Agreement approved by this Court's Orders of September 1, 1978, December 10, 1980 and February 9, 1983. The attorneys relied on the Retainer Agreement and operated under it throughout the litigation. Apart from the Retainer Agreement, were it not for the events described hereinabove which amounted to acts by Special Counsel in conflict of the interest of this estate, those fees would be fully justified by the result achieved, the risk assumed and the extent of the effort. For reasons set forth in the Conclusions of Law hereinbelow, those fees will be reduced by $142,684.92 to compensate the estate for loss suffered by the attorneys conduct and to impose a punitive sanction therefor.

41. Theodore M. Becker and the law firm of Becker & Tenenbaum and Gerry L. Spence, Edward P. Moriarity and the law firm of Spence, Moriarity & Schuster are further entitled to reimbursement of all expenses necessarily and reasonably incured and paid by them in connection with the litigation, subject to further scrutiny

---

4. The Trustee computed only $745,722.06 surplus, but substantially over-estimated the payment to Referee's Salary and Expense Fund which would require a maximum payment far less than that estimated.

thereof by this Court at a later hearing that has been set by separate Order.

42. The Trustee has received claims for litigation expenses from McCorkle Court Reporters, Haiman Photo Services, Inc., Trial Base Company and Wolfe Rosenberg & Associates, which initially were disputed as to amount. The Trustee has recommended payment of said litigation expenses, which McCorkle, Haiman, Trial Base and Wolfe Rosenberg have agreed to accept as follows: (1) $7,525.20 to Wolfe, Rosenberg & Associates, Inc.; (2) $16,757.10 to Haiman Photo Services, Inc. and Trial Base Company; and (3) the sum of $25,335.80 to McCorkle Court Reporters, Inc. Said recommendation will be examined further by this Court at a later hearing set by separate Order.

43. During the pendency of the Chapter XI proceedings and pursuant to Order of the Bankruptcy Court, Central, as Debtor-In-Possession, paid litigation expenses of $6,714.26. Thereafter, pursuant to Order of the Bankruptcy Court, the Trustee disbursed the sum of $10,000.00 for litigation expenses from the general funds of Central's Estate. Thereafter, pursuant to Order of the Bankruptcy Court, after Notice and Hearing, in order to obtain funds necessary to pay continuing expenses of the litigation, the Trustee entered into seven agreements with various parties whereby the Trustee borrowed, with interest as set forth in said agreement, funds necessary for said litigation expenses. All funds advanced to the Trustee pursuant to said agreements and disbursed by the Trustee for litigation expenses were disbursed pursuant to orders of the Bankruptcy Court upon Notice and Hearing and all disbursements were made in strict accordance with the Orders of Court. The date of the Order of Court, the lending party, the amount authorized, the interest rate and the amount disbursed pursuant to each agreement and to Orders of Court is set forth as follows:

| DATE OF COURT ORDER | LENDING PARTY | AUTHORIZED AMOUNT | INTEREST RATE | DISBURSED AMOUNT |
|---|---|---|---|---|
| 1–6–81 | George S. Kamberos | $ 50,000.00 | $100,000.00 | $ 50,000.00 |
| 8–17–81 | GSK Corporation | 100,000.00 | 25% | 100,000.00 |
| 6–24–82 | GSK Corporation | 100,000.00 | 20% | 100,000.00 |
| 7–28–82 | Leon Stellings | 50,000.00 | 20% | 50,000.00 |
| 11–15–83 | GSK Corporation | 100,000.00 | 20% | NONE |
| 1–10–84 | GSK Corporation | 50,000.00 | 20% | 50,000.00 |
| 11–6–84 | Barbara Cummings Leon Stellings Tina Stellings | 373,751.16 | 20% | 181,105.21 |
| | | | | $531,105.21 |

A total of $531,105.21 has thereby been made available to the Trustee pursuant to said agreements and disbursed pursuant to Orders of Court for expenses of litigation. Interest on the $531,105.21 in the amount of $307,536.85 accrued as of September 6, 1985 pursuant to said agreements and the Court Orders authorizing disbursement described hereinabove. Interest continues to accrue on said amount at the rate of $277.29 per diem until paid. The Trustee is obligated to make payment from the Settlement proceeds to the aforementioned lending parties or their valid assigns of the disbursed amount and interest in accordance with the above described Orders. Such payment will not be made until the Trustee receives full payment of the McDonald's settlement and informs all parties of computations of the separate amounts due each lender for principal and interest to date and until paid, as provided by separate Order for such notice.

## CONCLUSIONS OF LAW

### Approval of the Settlement

1. The Bankruptcy Act of 1898 as amended governs this liquidation proceeding. Section 27 of The Bankruptcy Act

provides that "[t]he receiver or trustee may, with the approval of the court, compromise any controversy arising in the administration of the estate upon such terms as he may deem for the best interest of the estate." 11 U.S.C. § 50. This Section applies to compromises arising in all Chapters of the Act, however, the "best interest of the estate" takes on a different meaning depending on whether the goal in Bankruptcy is reorganization or liquidation. *In re Blair,* 538 F.2d 849 (9th Cir.1976).

2. The Court has compared the terms of the Amended Settlement Agreement with the likely rewards of continuing litigation. In evaluating the settlement offer, the Court has considered the following standards prescribed by the United States Supreme Court in *Protective Committee for Independent Stockholders, etc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), *reh. den.* 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425 (1968): (a) the probabilities of ultimate success in the litigation; (b) the complexity, expenses, and likely duration necessarily attending it; (c) the possible difficulties of collecting on any judgment ultimately upheld (which is not a factor in this case because of McDonald's apparent affluence); and (d) other factors relevant to a full and fair assessment of the proposed compromise. *Protective Committee* involved a corporate reorganization proceeding under Chapter X of the Bankruptcy Act, in which stockholders challenged the approval of a plan of reorganization which involved compromises of claims against the debtor.

3. In approving a settlement in a liquidation proceeding, the Court must determine what course of action is in the best interests of the Estate, with major consideration to the interests of the creditors. *Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929). A proposed settlement in a liquidation proceeding should be approved if it provides for "the best possible realization upon the available assets ... without undue waste or needless or fruitless litigation." *In re Kearney,* 184 F. 190, 192 (N.D.N.Y.1910); *In re Blair,* 538 F.2d 849,

852 (9th Cir.1976). Given the fact that approval of the settlement will result here in sufficient proceeds to pay in full all allowed claims of creditors, no creditor has or can maintain a legitimate objection to the proposed settlement. The Court has considered the views of the objecting shareholders and persons who claim an equity interest in Central. *See, e.g., In re Van Camp Products Co.,* 95 F.2d 206 (7th Cir.) *cert. den.* 305 U.S. 605, 59 S.Ct. 65, 83 L.Ed. 384 (1938); *In re W.T. Grant Co.,* 10 B.R. 801, 806 (Bkrtcy.S.D.N.Y.1981). Moreover, under all the circumstances the settlement is also fair to stockholders, in that it will provide a million dollars to distribute to stockholders. To seek greater return for the shareholders at risk to the creditors would be most unfair. A creditor supplies to a business in return for getting paid an agreed price. A stockholder puts up risk capital as an investment. The creditor's interest is given major consideration because it is fair that creditors who expected and deserved no risk should not now risk losing all in an effort to recover more for investors.

4. The creditors here should not be compelled, against their unanimous wish, to engage in protracted litigation at large cost and with great risk. *Drexel v. Loomis, supra* at 807. See also *In re Ira Haupt & Co.,* 252 F.Supp. 339, 342 (S.D.N.Y.1966). The Trustee and Special Counsel recommended that the Court approve the Amended Settlement Agreement after almost eight years of difficult and complex litigation. Under Section 47 of the Bankruptcy Act, the Trustee has an obligation to collect and reduce to money the property of the Estate as expeditiously as is compatible with the best interests of the parties in interest. 11 U.S.C. § 75(a)(1). The Trustee, in recommending the proposed settlement, is not required to establish the outcome of the litigation to a legal certainty. *Florida Trailer and Equipment Co. v. Deal,* 284 F.2d 567 (5th Cir.1960). Rather, the Trustee must establish to the reasonable satisfaction of the Court that, all things considered, it is prudent to eliminate

the risks and delays of litigation to achieve certainty rather than litigate to the bitter end, even where the certain amount obtained by settlement is less than the possible ultimate recovery. *Drexel v. Loomis, supra.* See *In re Ira Haupt & Company,* 304 F.Supp. 917, 933 (S.D.N.Y.1969).

■ 5. The only asset of this Estate is the Lawsuit. Approval of the Amended Settlement Agreement (as finally amended by the McDonald's offer to pay interest thereon until paid) is in the best interest of the Estate and provides sufficient realization upon that asset without undue waste or needless, possibly fruitless future litigation in the state trial and/or appellate courts. The Court has weighed the probable risks and benefits; the complexity, hazards and expense of continuing the litigation, the time required and consequent delay in the Trustee's administration of the Estate, and has given due consideration to the principle that the law favors compromise. *In re Blair, supra.* Based upon all the evidence presented, the Court finds that approval of the Trustee's Application is fair, reasonable and the wisest course. *In re Blair, supra.* at 851.

6(a). This Court assumes the likelihood that Central would prevail on the post trial motions now pending in Circuit Court. While no one could say for certain, it appears unlikely that the trial judge would reverse himself on the crucial rulings made during trial. But that in no way answers the issues to be weighed by this Court in considering the offered settlement. If that case is appealed, each of the many crucial issues of mixed fact and law must be fought out again on appeal before a three-judge appeals court, and several of those issues are of a type that could well persuade the Illinois Supreme Court to grant leave to appeal so as to require review at that level as well.

(b) In short, each of those complex legal-factual issues must be reargued on appeal in the state court litigation if it is not settled. This Court read all the post trial briefs and arguments with great care. Whereas Central succeeded in persuading

the trial judge that it was right on each major issue, it must on appeal persuade two appellate judges and very possibly a majority of Supreme Court judges that it was right on each of those many substantial issues. In short, it must run the race again before new judges, must persuade a majority of those judges that it was right on the major questions. Most of the many issues discussed in the post trial briefs are of such complexity and magnitude that the appellate process will indeed be what Spence called a gamble, a gamble for McDonald's and a gamble for this estate. If Central fails to persuade a majority of appellate judges on most of those major issues, it will falter and face either retrial or reversal without retrial. In the face of that risk on appeal, the $300,000 Letter of Credit offered here to support litigation expenses is relevant but totally inadequate. That is a sum probably more than needed to pay appeal expenses, but it is meaningless if any appellate level court were to require a new trial with all of the enormous difficulties of retrial that have been described here. As Becker testified, had they faltered at any step they could not have recovered. Refusing this settlement would clearly mean the risk of such faltering in the future.

(c) For those reasons, and because of the factual findings made above, under all the circumstances heard the Court would clearly be wrong to reject this substantial settlement, which is much larger than the Debtor and its President and counsel were bargaining for before and during the litigation.

### 7. *Conflict of Interest*

■ (a). It has been argued that the Special Litigation Counsel acted in conflict of interest, and the court finds that they did indeed so act. Cummings refused to sign a personal ·release as originally requested by McDonald's unless he would be compensated for his personal claims. There is nothing strange about such a request on his part. But when the lawyers then allowed themselves to bargain with McDonald's both on behalf of the bankrupt-

cy estate and at the same time for Cummings, they laid the egg of potential conflict of interest.

(b) Spence relayed to a high McDonald's officer the request of Cummings for a personal payment, in return for his personal release. The initial reaction of that McDonald's official was that he would take the $15.5 million offer directly into this Court and drop the request for Cummings' release. If Spence believed up to that moment that it was necessary to relay Cummings' demands to McDonald's in order to keep the settlement talks moving, he should have been disabused of that belief at that moment. Once a high McDonald's official suggested the direct offer into Court without requiring Cummings' signature, the only proper course for Spence and the other lawyers was to pursue that course and tell Cummings to get his own separate counsel to pursue his personal claims separately. Instead, by his own testimony Spence talked the McDonald's officer out of tendering the full $15.5 million to the estate without Cummings' release being required. The egg of potential conflict thereupon hatched into actual, plain, and obvious conflict. Spence then negotiated for $4 million to be deducted from the sum previously offered to this estate and for that sum to be offered instead to Cummings who was also a client of Special Litigation Counsel, leaving only $11.5 million for the estate. The other Special Litigation Counsel ratified Spence's course of action, and none repudiated it; therefore all are bound by the consequences that must be attached to it.

■ (c) What should those consequences be? Some have argued here that the whole offer must be rejected as tainted. Had the original $11.5 million offer to the estate remained on the table with $4 million offered to Cummings, this Court would have seriously considered rejecting a settlement which thereby was the tainted product of such obvious violations of both general professional obligations and obligations of counsel for a Trustee in Bankruptcy. But McDonald's quickly withdrew that offer af-

ter these hearings started, and offered the Amended Settlement as later amended and approved by this Court. The full $15.5 million was offered to this estate and nothing to Cummings. In effect, McDonald's returned to its expressed willingness to offer the full sum to this Estate without Cummings' release in return, and then improved that offer by an agreement to pay interest thereon. Thus, the present offer is in no sense tainted. Nor would it make any sense, nor would it be fair to the many interested parties, nor would it be in conformity with the Court's obligation to weigh the settlement by judicially defined standards, to accept the argument that the settlement should be rejected because it was temporarily diverted by the attorneys' conflict of interest, although later fully restored and even improved.

(d) It has also been suggested that the attorneys involved should all be disqualified and fired. Those Special Litigation Counsel performed for long years fine, skillful and loyal services to this estate, one of the best jobs of lawyering this Court has ever seen, up to the moment that the conflict of interest arose. They brought the case to a most successful verdict because they are dedicated, skillful, and possess endurance, courage, and great professional and personal energy. They have been the swords by which this estate has thus far prevailed, and it would ill serve this estate to discard those swords.

(e) Others have suggested that those attorneys, through the acts in conflict of interest, only brought $11.5 million into Court, and that the hearing process restored the other $4 million. So, it is argued that they are not entitled to receive a contingent fee on the last $4 million of recovery, either on a theory that they are contractually not entitled to it or as a sanction for their conduct. The latter suggestion was considered very seriously, but was not approved. It would not be a fair reading of the evidence and record to deny that these attorneys were responsible for the full $15.5 million offered, and their contingent fee agreement approved long ago pro-

vided for 40% of all sums received by settlement or otherwise. Further, while authority authorizes courts to eliminate fees entirely when conflict is found, it would not be fair or just to reduce the fees here by so great a measure as 40% of the $4 million as a sanction for the acts by these attorneys in conflict with their duties here. We must not forget that without their great effort and success at trial there would be no judgment win and no settlement offer.

(f) However, it is the Court's obligation to impose a significant and relevant sanction for what occurred. It is the obligation of attorneys for trustees and trustees in bankruptcy to bear single-minded allegiance to the estate they serve, and never act in conflict of that interest, or act in the interests of their friends or of other clients when in conflict with those of the estate. The law profession is a profession of honorable service and obligation, as well as a way of earning a living. The precedents discussing attorney conflict of interest do not use the word "honor", because in our profession the concept of honor is structured and defined by statutes requiring disinterest and professional principles barring conflict. However, those guidelines are construed, they mean that honorable lawyers cannot and must not serve two masters when the interests of those two masters are in conflict. The court has reviewed carefully the documents and circumstances which were asserted to justify what occurred, but found that no authority by this or any court was given to the lawyers to represent Cummings in any situation wherein his interests came in conflict with those of this estate. Nor can the time pressures imposed by McDonald's justify the acts in conflict where the attorneys never sought instructions from this Court when Cummings requested personal payment.

(g) Even if the Trustee has intended to or did ratify acts of his special counsel which were in conflict with and harmed the interests of this estate, the Trustee had no authority to do so. Special Counsel for a Bankruptcy Trustee may not contend that their conflict with Estate interests was ratified by the Trustee. That Trustee, as well as the litigation counsel, serve the law and its honorable requirements of conduct in the sole interests of the estate. The Trustee is not just another private client who was entitled to approve of or ratify the acts of his counsel bargaining for him and also for another at the same time and in conflict of the estate's interest.

(h) It is important to the Bankruptcy Court for this District and elsewhere that all attorneys and trustees be mindful of the foregoing principles. Therefore the Court decided that the fair and proper measure of sanction to be applied to the Special Litigation Attorneys for their actions referred to hereinabove as being in conflict of interest was pursuant to a separate Order deducting from their fees a sum to compensate the estate for lost interest on the $15.5 million settlement for 21 days of ultimate delay before the full offer was brought into open Court by McDonald's, with that figure doubled as a punitive sanction. By separate Order entered October 2, 1985, the Court computed and so ordered said deduction from fees at a total of $142,-684.92.

(i) It is clear that neither the Trustee nor his attorney may act in conflict of the interest of the Estate in Bankruptcy. This Court adopts as applicable here the extensive and well presented opinion of Bankruptcy Judge Clark in *In re Larry P. Roberts*, 46 B.R. 815 (Bankruptcy D.Utah, 1985) as authority relied on by this Court and for a discussion of standards that this Court applies here. The Code requirements of attorneys acting solely for the Estate ("disinterested") carried over from § 157 of the Act which required the attorney for the Trustee to be a "disinterested" person; see also Act § 158 and Bankruptcy Rule 10–206, 10–202(c)(2) for definition of "disinterested". Only the Court (not the Trustee) can approve employment of an "interested" attorney for special purposes. Bankruptcy Rule 10–206(b), *In re Progress*

*Lektro Shave,* 117 F.2d 602, [3] at p. 604 (2d Cir., 1941).

(j) Apart from Bankruptcy law, the ABA Model Code with pertinent Ethical Considerations makes clear that an attorney may not (except in private employment where his private client agrees) act in conflict with the interests of his client.

*Canon 5*—A lawyer should exercise independent professional judgment on behalf of a client.

DR 5–105(a): A lawyer shall decline proffered employment if the exercise of his independent professional judgment on behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, ...

DR 5–106: A lawyer who represents two or more clients shall not make or participate in the making of an aggregate settlement of the claims of or against his client, unless each client has consented to the settlement after being advised of the existence and nature of all the claims involved in the proposed settlement, of the total amount of the settlement, and of the participation of each person in the settlement.

*Canon 7*—A lawyer should represent a client zealously within the bounds of the law.

DR 7–101(a)(3): A lawyer shall not intentionally prejudice or damage his client during the course of the professional relationship....

*Canon 9*—A lawyer should avoid even the appearance of professional impropriety.

(k) The foregoing canons and rules apply to the failure of Special Litigation Counsel to withdraw from representing Cummings when he asked for a "piece of the pie". At that point, they could not represent both the interests of the Debtor (through the Trustee) which hired them, and also the interests of Cummings without hurting the interests of debtor. And they clearly could not negotiate a $4 million reduction of mon-

eys offered this Estate in order to benefit their other client.

■■■ (1) Where conflict is found in attorney conduct, this Court has discretion to impose a sanction up to and including penalty depriving counsel of all fees. *Matter of King Resources Co.,* 20 B.R. 191 (D.C. Colo.1982); *In re Watson Seafood,* 40 B.R. 436 (E.D.No.Car., 1984); *In re Chou-Chen Chemicals, Inc.,* 31 B.R. 842 (W.D.Ky., 1983); *In re Mary C. Paine,* 14 B.R. 272 (W.D.Mich., 1981); *In re Smith,* 5 B.R. 92 (D.C., 1980). However, there is authority in the Seventh Circuit for a rule less harsh than full forfeiture of fees, that is authority for reasonable allowance of fees for services of value. *Chicago & West Towns Railways v. Friedman,* 230 F.2d 364, 369 (7th Cir.); *cert. den.* 351 U.S. 943, 76 S.Ct. 837, 100 L.Ed. 1469 (1956). In all the circumstances here, this Court has concluded that the fee sanction imposed is the fair and appropriate one and declines in the exercise of discretion to impose the more common harsh sanction.

■■■ (m) Special Litigation Counsel suggest that their claim of attorneys lien under state law bars this Court from reducing their fees. Ill.Stat.Ann., Ch. 13, § 14. Since this Court was required to and did approve the contingent fee arrangement, it is clear that such approval was at all times subject to the foregoing authority that prohibited conflict of interest and punished it when found. Legislative history under Section 48 of the old Bankruptcy Act shows that authorization of fee control in the Bankruptcy Court was intended as one of the major reforms as early as 1938. Sen. Rep. No. 95–988, 95th Cong., 2d. Sess., 40–41 (1978), U.S.Code Cong. & Admin. News 1978, p. 5787, 5826, 5827. The power to determine amount of fees "rests exclusively in the Bankruptcy Court," "... [t]he jurisdiction which Congress has conferred on the Bankruptcy Court is paramount and exclusive ...," and "... the federal rule is the supreme law of the land...." *Brown v. Gerdes,* 321 U.S. 178 at 181, 183–4, 187–8, 64 S.Ct. 487 at 488, 489–90, 491–2, 88 L.Ed. 659 (1944). At least where attorney

conflict is found, Bankruptcy Court control over fee awards must and does supersede attorneys lien claims under state law. Otherwise federal authority would be meaningless and ineffective.

(n) Accordingly, assuming *arguendo* that the Illinois Attorneys Lien Act was strictly followed and adhered to and that a valid lien claim existed under that statute, but without reaching or deciding that point, this Court finds such lien claim subordinate to the authority of the Bankruptcy Court to impose the sanction against attorneys fees that has been ordered.

### *Stockholder Disputes*

8. In determining whether the compromise and settlement of the Lawsuit should be approved, it has thus far been unnecessary for the Court to determine the conflicting claims of alleged stockholders in connection with this proceeding. Those conflicting stockholder claims have in no way been determined herein, although all parties claiming an interest were given the right to be heard and present evidence in the interests of a fair hearing that aided the Court through hearing objectors as well as proponents.

### 9. *Jurisdiction over McDonald's to Enforce the Settlement*

(a) A dispute still exists between McDonald's and the Trustee as to the time that payment is due from McDonald's under the Settlement Agreement as is now approved. McDonald's claims that such payment is due when the order of approval is either not appealed or all appeals therefrom are completed with affirmance; thus the matter would be "final" before it paid the settlement. The Trustee claims that payment is due when the order of approval is "final" in the sense of being appealable. The Court has not heard testimony on the intent of the parties in using the word "final" in the Amended Settlement Agreement and makes no determination thereon at this time. However, it is appropriate that this Court which held such extensive hearings into the Amended Settlement Agreement which will produce the sole asset of this Estate determine any issues regarding its enforcement.

(b) Further, some objectors expressed concern that the State Court judgment might be vacated without their knowledge. Should McDonald's and the Trustee set aside their disagreement and agree to consummate the now authorized settlement with payment, it is appropriate that objectors learn of that in advance so they may seek a stay of such consummation pending appeal if they see fit to do so.

(c) A party that voluntarily participates in open court settlement and related proceedings and enters into an agreement before the Court subjects itself to the summary jurisdiction of the Bankruptcy Court with regard to enforcement of that agreement. *Sherman Plastering Corp.*, 340 F.2d 915, 918–920 (2d Cir., 1965). McDonald's here voluntarily and without invitation appeared in open court through counsel on July 10, 1985, to offer the gist of what became the Amended Settlement Agreement directly to the Court in a letter addressed to the Court (Court Exhibit 106). That is the offer that was later accepted. Subsequent appearances by McDonald's counsel were often at the encouragement of the Court and with assurance that those subsequent appearances did not constitute formal appearances. Based solely on the initial volunteered and unsolicited appearance by McDonald's counsel with the new offer on July 10, 1985, however, this Court can and should assert jurisdiction over McDonald's for the purpose of enforcing the settlement that now stands approved. Orders have therefore been entered asserting *in personam* jurisdiction over McDonald's with respect to enforcement of the Amended Settlement Agreement, and ordering it to appear formally through counsel. Also, trustee has been ordered not to proceed to consummate the settlement through vacation of the State Court judgment except on joint application with McDonald's to this Court of intent to do so, on notice to all parties here and a tender by McDonald's of the full settlement sum then due.

## MEMORANDUM AS TO EXPENSES REQUESTED BY SPECIAL LITIGATION COUNSEL

Special Litigation Counsel have requested and Trustee Chairman and his counsel have moved that this Court approve reimbursement to counsel for the following total litigation expenses they requested:

| | |
|---|---|
| Gerry L. Spence, Edward P. Moriarity and the law firm of Spence, Moriarity & Schuster | $ 72,799.64 |
| Theodore Becker and the law firm of Becker & Tenenbaum | 44,633.22 |
| Total | $117,432.86 |

Of the large number of attorneys who have appeared herein for different parties, none have questioned any of the expenses thereby requested. Nor has the Trustee or his counsel objected to any of those expenses or sought to request further detail as to any of those expenses.

Upon review of the rather sparse and often cryptic basis put forward by Special Litigation Counsel for the $117,432.86 they requested, this Court *sua sponte* on October 29, 1985, ordered Becker and Tenenbaum to supply all supporting detail back-up showing the exact nature of expenses advanced and the necessity for and reasonableness of all such expenses. No such back-up had previously been supplied. In the same order, the Court ordered that the more detailed application of the Spence, Moriarity firm be supplemented by detailed back-up for 39 categories of expenses not earlier documented.

Both firms have now fully responded. In doing so, the Spence firm has withdrawn many expenses earlier requested. This Court is now prepared to rule.

██ Both counsel are entitled under the terms of their approved retention to reimbursement of all necessary and reasonable litigation expenses incurred by them. Given the extraordinary nature and complexity of the McDonald's litigation, the size of the recovery sought and success achieved, the quality and effort put into the defense of that case, great latitude is appropriate in recognizing expenses that were "necessary and reasonable" in this litigation. Many aids, expenses, and support systems that would be inappropriate in lesser cases are commonly used in high-stake major complex litigation. Those supports to the trial lawyers sometimes can provide the margin for victory. In this case where the trial lawyers had extraordinary success at trial, it would be unfair to question the legitimacy of most expenses sought.

██ However, where "expenses" become ordinary personal matters or luxuries, or ordinary business expenses unrelated to this litigation, or office overhead, then they are neither "reasonable" nor "ordinary". There is no authority for a Bankruptcy estate to reimburse for ordinary personal needs, luxuries, unrelated office expenses, and ordinary overhead expenses under the guise of litigation expenses.

### Spence, Moriarity & Schuster

██ The Spence firm has withdrawn some of the unsupported expenses originally sought. Those and other expenses sought for telephone expenses of his law office unrelated to this case, membership in a health club, use of a hair stylist, meals to persons not working on the case, or unexplained and other totally unsupported expense requests are disallowed. Some use of a private office plane has not been found to be justified expenses here. From requested expenses, Exhibit A hereto shows the foregoing and other expenses which are disallowed in the total amount of $24,929.37. The remaining requested expenses will be approved by separate order.

### Becker & Tenenbaum

All expenses requested by this firm have been found reasonable and necessary, except for expenses incurred for borrowings by this firm. Those borrowings are explained as necessary to pay litigation expenses when litigation expense moneys loaned to this estate from various sources from time to time were not forthcoming. Therefore, the attorneys say they were required to borrow necessary moneys to keep

the McDonald's case going, and incurred interest debt thereby. For that they claim $1,748.08 paid to Palatine Bank on November 16, 1984, and another $13,059.11 paid to that bank the same date. They do not claim that this Court ever authorized those loans on behalf of this estate.

All attorneys must provide a cash flow to operate their business. All litigation lawyers must invest greater or lesser sums into their cases. The more fortunate recover those expenses quickly or have them advanced before needed. Others often advance such moneys at risk in the expectation of repayment by the client upon ultimate success and recovery. This Court cannot endorse a request for reimbursement of interest incurred by a law firm to borrow moneys to fund litigation when such borrowings were not authorized by the Court. Such approval would be tantamount to approving reimbursement of loan expenses to provide law firm cash flow capital when such loan expenses are normal overhead expenses of any litigation firm. To remove such expenses from "overhead", special litigation counsel should seek prior court approval of such loans. This Court will not sanction retrospective approval of expenses of that nature. Counsel took chances in borrowing cash capital without prior court approval and then applying such funds to use in the McDonald's litigation. Their investment will be repaid handsomely through the large contingent fees to which they will be entitled. It is not too much to ask that a firm that seeks and will recover such fees pay what amounts to its own overhead expenses.

Those interest charges are disallowed, for a total of $14,807.19. All remaining expenses sought will be approved by separate order.

---

Finally, this was a classic and all too typical case of a Bankruptcy Judge required to analyze detailed expense requests (three inches thick, as supplemented) without aid from any counsel or the Trustee. When the Trustee seeks fees here that are likely to be substantial, he will be expected to explain why he did not do the analysis of expenses that this Court has performed without any significant aid from the Trustee.

EXHIBIT A

Spence, Moriarity & Schuster Disallowed Expenses

| DATE | CHECK NUMBER | PERSON INCURRING | REASON FOR DISALLOWANCE | AMOUNT |
|---|---|---|---|---|
| 2/17/83 | 7627 | R. Schuster | unsupported, withdrawn | $ 434.04 |
| 4/1/83 | 7917 | E. Moriarity | unsupported, withdrawn | 500.00 |
| 5/18/83 | 8260 | E. Moriarity | unsupported, withdrawn | 1,000.00 |
| 12/83– 1/84 | 9509, 9510, 9776, 9886 | Cash, C. Herno, Diary | unsupported, withdrawn | 2,074.06 |
| 12/4/83 | 9512 | A. Gitter | unsupported, withdrawn | 187.00 |
| 12/16/83 | 9732 | E. Moriarity Disallow meals for Mrs. Spence (3), firm pilot (1), and Moriarity's personal expenses (Pro Shop ($45.21) and hair stylist ($35.00)) | | 175.00 |
| 1/17/84 | 9970 | E. Moriarity Disallow meal for firm pilot (1) | | 25.00 |
| 1/31/84 | 10092 | G. Spence Disallow meals for Mrs. Spence (2) | unsupported, withdrawn | 351.14 40.00 |
| 2/23/84 | 10244 | G. Spence | unsupported, withdrawn | 480.00 |
| 3/12/84 | 10354 | East Bank Club | unsupported, withdrawn | 684.45 |
| 3/12/84 | 10377 | Moriarity | unsupported, withdrawn | 179.46 |

| DATE | CHECK NUMBER | PERSON INCURRING | REASON FOR DISALLOWANCE | AMOUNT |
|---|---|---|---|---|
| 8/21/84 | 11502 | Becker & Tenenbaum | | $1,885.26 |
| | | Phone expenses from Chicago in connection with other law business of Spence firm, unrelated to McDonald's case | | |
| 8/15/85 | Flights 1523, 1524 | | | 950.00 |
| | | Private plane expenses not shown necessary or reasonable | | |
| 6/25/85 | | SMS | | 931.96 |
| | | Excessive xerox charges withdrawn | | |
| 6/25/85 | | SMS | | 1,500.00 |
| | | "estimated phone expenses" for use of WATS line from law offices in Wyoming, appears to be ordinary overhead expenses not chargeable to this case | | |
| 6/25/85 | | U.S. Post Office | | 100.00 |
| | | "estimate for postage", appears to be ordinary overhead expense | | |
| 10/23/83 | | Empty flight of private plane | | 1,800.00 |
| 11/18/83 | | Empty flight of private plane | | 1,900.00 |
| 12/14/83 | | Frontier Airlines | unsupported, withdrawn | 321.00 |
| 12/7/83 | | Empty private plane flight | | 1,700.00 |
| 12/18/83 | | Empty private plane flight | | 900.00 |
| 12/21/83 | | Unnecessary private plane flight | | 700.00 |
| 12/15/83 | | Empty private plane flight | | 935.00 |
| 1/3/84 | | Family flight on private plane unrelated to litigation | | 950.00 |
| 12/15/83 | | Tickets billed on Teton World Travel invoice not used; claim withdrawn | | 1,188.00 |
| 12/19/83 | | Tickets billed on Teton World Travel invoice not used; claim withdrawn | | 1,188.00 |
| 1/18/84 | | Empty private plane flight | | 1,850.00 |
| | | | TOTAL DISALLOWED | $24,929.37 |