In re CENTRAL ICE CREAM COMPANY, Debtor.

**Appeal of Theodore M. BECKER and the Law Firm of Becker & Tenenbaum, Special Litigation Counsel to the Trustee, and Gerry Spence, Edward P. Moriarity and the Law Firm of Spence, Moriarity & Schuster, Additional Special Litigation Counsel to the Trustee, From Portions of the "Order as to Attorneys Fees" Entered by Bankruptcy Judge Jack Schmetterer on October 2, 1985, and Certain Findings of Fact and Conclusions of law Entered by Bankruptcy Judge Schmetterer on Oct. 9, 1985.**

Nos. 85 C 10073, 86 C 1831. Bankruptcy No. 78 B 4820.

United States District Court, N.D. Illinois, E.D.

Sept. 19, 1989.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

This matter involves an appeal by Special Litigation Counsel, Theodore M. Becker ("Becker"), the law firm of Becker & Tenenbaum, Gerry Spence ("Spence"), Edward P. Moriarity, and the law firm of Spence, Moriarity & Schuster, Special Litigation Counsel to the Trustee (hereinafter "Special Litigation Counsel"), from portions of an order reducing attorney's fees entered by the bankruptcy judge (No. 85 C 10073), and an appeal by Becker and the law firm of Becker & Tenenbaum, from portions of an order disallowing certain expenses (No. 86 C 1831). The court was assisted in this matter by *amici curiae* appointed for purposes of defending the decisions under appeal inasmuch as all parties with standing either had taken no position on the appeal or urged reversal. *See U.S. v. Haldeman,* 559 F.2d 31, 138 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

The matters giving rise to these appeals arose out of attempts to settle a state court judgment obtained by Central Ice Cream Company ("Central") against McDonald's Corporation ("McDonald's"). The bankruptcy judge in his decision approving the settlement made extensive Findings of Fact and Conclusions of Law, most of which are either irrelevant to this appeal or not disputed. *See In re Central Ice Cream Company,* 59 B.R. 476 (Bankr.N.D.Ill.1985).

In summary, according to the bankruptcy judge's Findings of Fact (*id.,* pp. 478–86), in 1977 Central filed a suit in the Circuit Court of Cook County seeking actual and punitive damages against McDonald's arising out of an alleged breach of an oral agreement for the purchase of ice cream. The Chairman of the Board and President of Central was Thomas N. Cummings ("Cummings"), who retained Becker and the law firm of Becker & Tenenbaum in 1976 to prosecute Central's claim against McDonald's. The agreement, *inter alia,* provided for remuneration in the amount of forty percent of all monies and sums recovered by suit, settlement or otherwise. It also provided that all costs, expenses, filing fees, and "all other expenses" were to be paid out of Central's share of any recovery.

On June 26, 1978 Central filed a petition under Chapter 11 of the Bankruptcy Act, and on September 1, 1978, after an evidentiary hearing, Central (as debtor in possession) was authorized by the bankruptcy court to retain Becker and his law firm as Special Litigation Counsel for the purposes of continuing the representation of Central in the lawsuit against McDonald's. The order approved and affirmed the retainer agreement previously entered into between Central, Cummings and Becker & Tenenbaum.

Central was adjudicated a bankrupt on April 29, 1980 and Bernard C. Chaitman was appointed Trustee ("Trustee"). On December 10, 1980 the Trustee was authorized to continue the retention of Special Litigation Counsel upon the same terms and conditions as contained in the order of September 1, 1978.

In 1981 McDonald's filed in the circuit court a motion to disqualify Special Litigation Counsel on the ground that they were representing Cummings and his family on matters not involved in the suit. The motion was denied after Special Litigation Counsel obtained an acknowledgement and consent to representation that was signed by the Trustee, Cummings and certain shareholders of Central. It was considered to be to the advantage of the creditors and other parties in interest to have Cummings cooperate, assist and work closely with Special Litigation Counsel inasmuch as he was to be Central's chief witness and representative in court.

On February 9, 1983 the Trustee was authorized by the bankruptcy court to retain Gerry L. Spence, Edward P. Moriarity

and the law firm of Spence, Moriarity & Schuster as additional Special Litigation Counsel to assist Becker in connection with the lawsuit and to share in the contingent fees previously approved.

The prosecution of the lawsuit against McDonald's proved to be daunting and Special Litigation Counsel spent enormous effort in time and money, including 45,000 hours of work, the taking of 40 depositions, the marshalling, production, inspection and analysis of over 500,000 documents and the consultation of experts. The cost of the proceeding was far beyond Central's ability to finance and the estate borrowed in excess of $500 thousand at steep annual interest rates for payment of costs, which was approved by the bankruptcy court. In addition, Becker & Tenenbaum borrowed the sum of $150 thousand to pay additional litigation expenses when expense money loaned to the estate from time to time was not forthcoming. They incurred $14,807.19 in interest charges for these non-approved borrowings which were ultimately disallowed by the bankruptcy judge.

The trial of the lawsuit commenced on October 24, 1983 in the Circuit Court of Cook County and lasted for 13 weeks, where 28 witnesses, including experts, testified. Three attorneys tried the suit on behalf of Central and the Trustee, with support personnel of more than 20 persons devoting all or significant portions of their working hours plus overtime. The trial resulted on January 20, 1984 with a verdict in favor of Central and against McDonald's on breach of contract and fraud counts in the amount of $52 million, upon which judgment was entered.

From time to time after the judgment was entered Spence had discussions with certain of McDonald's officers in an attempt to obtain an offer of settlement, but none was forthcoming.

On June 15, 1984 McDonald's filed its post-trial motion with an 192–page supporting memorandum. On January 4, 1985 Central filed its 673–page response and on March 22, 1985 McDonald's filed an 138–page reply. Hearing and oral arguments were had on May 17, 1985 and the circuit judge set the date of Friday, June 21, 1985, for his ruling on the post-trial motion.

On Friday, June 14, 1985, only one week prior to the scheduled ruling date, settlement negotiations were initiated by McDonald's Chairman, Fred Turner ("Turner"), by way of a telephone call to Spence. Subsequent settlement discussions were carried on under extreme time pressure imposed by Turner's insistence that settlement negotiations be concluded prior to the scheduled June 21, 1985 ruling date on McDonald's post-trial motion. He also insisted that "all loose ends be cleaned up" and that McDonald's lawyers be satisfied with the documentation. Negotiations were carried on only with Spence, also at Turner's insistence. Initially, Turner offered approximately $11 million, which was later that day raised to $15 million, but these offers were rejected by Spence.

On Monday morning, June 17th, Turner made what he termed his final offer in the sum of $15,499,999.99, subject to approval of McDonald's Board of Directors, which was obtained later that day.

Spence concluded that this figure was indeed McDonald's final offer and immediately informed Becker of the settlement offer and Becker in turn informed the Trustee's independent counsel, James E. Carmel ("Carmel"). McDonald's was asked to put the offer in writing. On Tuesday, June 18th, at about noon, McDonald's counsel delivered to the office of Becker & Tenenbaum a draft "settlement agreement" which required that it be signed by Cummings personally and a release to be signed by Cummings as President of Central as well as a personal release waiving any and all claims Cummings might individually have against McDonald's. In return, McDonald's would deposit the $15.5 million with the Clerk of the Court. The documents did not indicate whether any of the offer was to go to Cummings. The proposed agreement was immediately delivered to Carmel by Becker for his approval. Becker met personally with Cummings who however refused to sign the proposed settlement agreement or to execute the requested personal release without separate

compensation for certain personal claims he was prepared to assert against McDonald's. Cummings' negative position was reported to Carmel and Spence, and Spence in turn reported it to Turner. Carmel reported that the Trustee also objected to the proposed settlement agreement because it provided for deposit of funds with the Clerk of the Bankruptcy Court without any indication as to the manner in which the funds were to be allocated between Central and Cummings.

Turner then restated McDonald's position that unless settlement documents were signed by Thursday, June 20th, McDonald's offer of settlement would be withdrawn and no further offer would be made irrespective of the outcome of the circuit court's ruling on the post-trial motion. Turner then left the country and instructed Spence to conclude negotiations with McDonald's attorneys.

On June 19, 1985 Spence relayed to a Mr. Horowitz ("Horowitz"), a high officer of and attorney for McDonald's who was placed in control of the negotiations in the absence of Turner, Cummings' refusal to sign the requested personal release without personal compensation for his claims against McDonald's.

The Findings of the bankruptcy judge subsequent to this point in time form the basis for his sanctions against Special Litigation Counsel.

According to the bankruptcy judge's Findings of Fact, which are based solely upon his interpretation of Spence's testimony before himself on August 8, 1985 (*see In re Central Ice Cream Co.*, 59 B.R. at 482 n. 3,[1] Horowitz' initial reaction to the fact that Cummings was requesting a personal payment was to threaten to take the $15.5 million offer directly to the bankruptcy court and drop the request for Cummings' personal release. Instead of acquiescing to this threat, Spence talked Horowitz out of

doing this and into considering apportioning some of the $15.5 million to Cummings personally. Spence then proceeded to negotiate with Cummings in order to determine how much of the $15.5 million he wanted in return for his signature. The result was that Cummings agreed to accept $4 million, leaving $11.5 million to satisfy Central's judgment. Horowitz subsequently agreed to this allocation and McDonald's attorneys on June 20th drew up an amended settlement agreement reflecting this apportionment. This amended agreement was executed later in the afternoon of June 20th by Cummings and the Trustee. It was subsequently submitted to the bankruptcy court on June 28, 1985 for approval.

Becker kept the Trustee, through Carmel, informed of all progress and developments in the settlement negotiations and all actions of Becker and Spence were approved by the Trustee prior to application being made to the bankruptcy court.[2] Notice of the application for approval was sent to creditors and other interested parties and five responses were elicited, four of which objected to Cummings' separate settlement.

The hearing commenced on July 9, 1985 at which Becker testified about the general nature of Cummings' possible personal claims against McDonald's.[3] Because Becker was under state court order not to disclose one of the claims, he agreed to provide a further explanation of Cummings' personal claims *in camera*.[4]

On July 10, 1985 Gregory Lane, one of McDonald's attorneys, appeared before the bankruptcy judge voluntarily and without invitation, offered on behalf of McDonald's to pay the full $15.5 million directly to the Trustee and to withdraw the requirement that Cummings give his personal release. Thereafter the Trustee received an amend-

---

1. The note is in error: Spence's testimony was on August 8, 1985, not September 9, 1985.

2. The bankruptcy judge found that by failing to object to Spence's conduct of the negotiations, Becker & Tenenbaum ratified it.

3. According to Becker's testimony, one of the claims involved tortious interference with a post-judgment employment relationship Cummings had with Borden's.

4. The indication was that the charges were libelous *per se* and were based upon hearsay.

ed settlement agreement from McDonald's containing these changes.

Notices of the hearing on the amended settlement agreement were sent out, eliciting three responses, one favorable and two, including one from Cummings, objecting to sufficiency of the $15.5 million offer. The bankruptcy judge on October 9, 1985, after many weeks of evidentiary hearings evidence, concluded that the settlement was in the best interest of the bankruptcy estate and approved the settlement, *id.*, 59 B.R. at 476. He also found that Special Litigation Counsel had acted in conflict of interest. He also approved payment of attorney's fees to Special Litigation Counsel in the agreed amount of 40 percent of the settlement amount but imposed sanctions to compensate the estate for loss of interest caused by the delay in presenting the final amended offer of settlement.[5] He reduced attorney's fees by the sum of $71,342.46 for compensatory reasons and imposed a like amount as a punitive sanction for conflict of interest.

The basis for the imposition of the compensatory and punitive sanction by the bankruptcy judge was his finding that Spence, on June 19, 1985, acted in conflict of interest when he allowed himself to bargain with McDonald's on behalf of Cummings for a portion of the $15.5 million settlement figure after he had been told quite clearly by Horowitz that McDonald's would drop the request for Cummings' personal release. Thus, according to the bankruptcy judge, it was incumbent upon Spence to pursue the course which was most beneficial to Central even though it was detrimental to Cummings. Instead of pursuing the proper course Spence talked Horowitz out of dropping McDonald's demand for Cummings' personal release. His actions therefore violated the bankruptcy law and the ABA Model Code, Canons 5, 7 and 9, all of which require that attorneys refrain from acting in conflict of interest. Thus, in his judgment, a sanction was appropriate.

Special Litigation Counsel vociferously objected to the conflict of interest Finding and the sanction on a number of grounds. Principally, that Special Litigation Counsel followed the only practical course the circumstances would allow, that they disclosed all facts and circumstances surrounding the settlement offer, that the bankruptcy judge misconstrued Spence's testimony, that they acted ethically at all times, and that the bankruptcy judge had no authority to impose the sanctions in the form that he did.

On the other hand, McDonald's as *amicus curiae*, contend that the bankruptcy judge was correct in his factual Findings arising from Spence's testimony and that his sanction was mandated by bankruptcy law and the Code of Professional Responsibility and was within his authority.

## DISCUSSION

Special Litigation Counsel and McDonald's agree that the standard review of this court to apply is "clearly erroneous" for Findings of Fact and *de novo* for Conclusions of Law. Bankruptcy Rule 810; *In re Matter of Supreme Plastics, Inc.*, 8 B.R. 730, 734 (N.D.Ill.1980). Specifically, as applied to this case, the clearly erroneous standard applies to the bankruptcy judge's Findings of Fact particular to this case, but this court will review *de novo* his Conclusion that under the particular facts a conflict of interest was created. *In re Roberts*, 75 B.R. 402, 412 (D.Utah 1987).

The "egg" of conflict (to use the bankruptcy judge's metaphor) allegedly occurred on June 19, 1985 in a telephone conversation between Spence and Horowitz, who is described as a "high officer and attorney of McDonald's". According to the bankruptcy judge's Finding of Fact No. 25, after Spence informed Horowitz that Cummings was demanding personal payment in return for the requested personal release, "the initial reaction of that McDonald's official was that he would take the $15.5 million offer directly to this court

---

**5.** The bankruptcy judge reasoned that 21 days elapsed between the submission of the $11.5 million offer and the amended offer of the full $15.5 million. Twenty-one days at 8 percent on $15.5 million equaled $71,342.46.

and drop the request for the Cummings release." The Finding goes on to state that, "Spence did not pursue that possibility but talked the McDonald's officers out of tendering the full $15.5 million offer to the estate without Cummings' release be required."

The testimony that apparently formed the basis of the bankruptcy judge's Finding on this point was the following:

BY MR. BECKER:

Q Did Mr. Horowitz indicate to you at that time or at any time prior to that that he was willing to waive the requirement of Mr. Cummings' signature and personal release?

A I think that—I think that at one time he threatened me in this fashion: He said, "All right. We will just go around and we will just take this directly to the bankruptcy court ourselves."

Q But what did you say?

A "And without Tom Cummings' signature.

And I said, 'Well, that's fine. That's okay with me. That's perfectly all right with me," I said.

"But I want you to understand something: that my deal with Fred Turner is to get this deal set up and complete if I can, and to get—and before this thing can fly, his Honor has to approve it. And before his Honor will approve it, I think that people pretty much have to agree."

"What would his Honor do," I said, "if Tom Cummings comes in, who is— this is the man in the case. This is really his case. It was his company, it is his case, it has been his case, he is the principal shareholder, he is the chairman of the board of Central Ice Cream Company, he represents a majority of the stock, and he says, 'Your Honor, I don't want the deal. I don't like this deal. We are being sold down the river.' Do you think his Honor is going to approve that?"

Well, that cut that out then. He wasn't going to go to the bankruptcy court without Tom Cummings. And so—

(Ex.E, pp. 68–69)

and

THE COURT:

Sir, a few minutes, I understood you to say that you were talking to the gentleman in the car, the lawyer from McDonald's. I wrote down that you said to him, "What difference does it mean to you who the 15 million is to be paid to?"

And at one point he said, "We will take this direct to the bankruptcy court without the signature of Tom Cummings."

THE WITNESS:

Absolutely.

(Ex.E, p. 75)

However Spence immediately explained his actions as follows:

THE COURT:

And that you went on to talk to him about how perhaps a bankruptcy court would not approve of something without Mr. Cummings' participation?

THE WITNESS:

Yes. I said—

You see, our obligation here to the creditors is this as I see it, Judge: If we don't have an agreement that your Honor is going to approve, we ain't got anything.

And how—and I said to him—he said—

And it became very clear to me immediately that what he was doing was threatening me with that. He was just saying, "Well, if you don't put this thing together like we want it, we will go to the bankruptcy court."

I said, "Fine. Go directly to the bankruptcy court. Do whatever you want to. That's okay with me. But if you do, I don't think that Tom Cummings is going to agree to it. And after all, this is really his deal. Why should a judge approve a deal that would eliminate Tom Cummings and do that kind of an injustice to Tom

Cummings?" He just wouldn't do that.

And so I said—and then he immediately saw that I was agreeable that he do that if he wished, and he went back to the other position.

(Ex.E, pp. 75–76)

\* \* \* \* \* \*

I never even—I never even thought of the word "conflict" until you called me up one day and said that these people over here were screaming "taint".

I couldn't believe it. I mean, here's Mr. Cummings and here are us who have been working for seven years in a deal to—an extraordinary piece of litigation. I get a $15 million offer, bring it to the court and lay it out to the court in every detail with every facet of the detail set out with a full revelation to Mr. Chaitman and to his attorney and to your Honor which—there is no conflict until—there is no conflict until—until the agreement somehow is acceptable, it comes to this court.

And the only way that we could get the agreement to the court, your Honor, from McDonald's, was to make sure that all of the loose ends were cleaned up. We had to clean up all of the loose ends. We had to get Mr. Cummings to sign that agreement.

And I don't want you to be misled by my statement that they offered to do it without Mr. Cummings as a serious offer because I took it—it didn't last 20 seconds, that whole idea.

He says, "Well, we will come to the court," and saying we will go around you so that we won't have to worry about this any more. We will go to the court and just offer $15.5 million to the court. And I said, "Good. Go ahead and do that. But the obligation that we have is to see that this matter is accepted."

And I didn't understand how you were going to accept an agreement in any justice or equity that didn't somehow address the just claims of Mr.—of Mr. Cummings as well as everybody.

He was—he was the principal party who was responsible for this case having been successful.

So—and I thought that you recognizing that would say, "Well, gentlemen, we are not going to accept any agreement that leaves Mr. Cummings—leaves him out of the dark.

So I told him that. I said, "If Mr. Cummings comes in and makes a very serious objection about this, you are not going to have an agreement anyway. No judge is going to do that." That's what I said to him.

(Ex.E, pp. 80–82).

In other words, Spence clearly did not believe that McDonald's was serious in offering to settle the case without Cummings' release and also did not believe that if Cummings, the majority shareholder of Central Ice Cream and one of its creditors, strenuously objected to the settlement that the bankruptcy court would approve it (see Ex.E, pp. 77–78). There certainly was justification for Spence believing that Horowitz was not at that time seriously proposing to drop the requirement of Cummings' release. He had been told by Turner that the case was to be settled by Thursday, June 20, 1985, for $15.5 million through execution of settlement agreements approved by McDonald's attorney that tied up all loose ends. It would be unlikely that some lower official, in the absence of Turner, would on his own authority eliminate the requirement that the settlement extinguish Cummings' personal claims. Spence's belief was corroborated when Horowitz immediately dropped the threat to settle without Cummings' signature.

Another justification for Spence's actions was the severe time constraints that Turner and the judge of the Cook County Circuit Court had placed on the negotiations. Spence had been told in no uncertain terms by Turner that the settlement would be automatically withdrawn if not accepted by the time the judge handed down his ruling on the post-trial motion. Turner had left the country so that this condition could not be counter-manded. The judge had refused to put off his ruling which was set to be

handed down on Friday morning, June 21, 1985. It was therefore necessary for Spence to get an agreement executed that was acceptable to Cummings as well as to McDonald's and the Trustee. There is no specific evidence (neither Turner nor Horowitz testified) that McDonald's would, prior to the ruling date, have accepted a signed agreement without Cummings' signature and his personal release. Spence categorically says McDonald's would not have done so. He testified:

Q I will put a question to you.

Prior to July 10th, you were just referring to McDonald's changing the deal, Mr. Lane coming into court, had anyone from McDonald's offered a settlement strictly to the trustee or to this estate in bankruptcy, strictly for the settlement of the lawsuit, that did not require the personal release of Cummings?

A Absolutely not.

Further, Spence at no time attempted to go behind the back of the Trustee, or the court for that matter. He, through Becker's efforts, kept the Trustee's attorney, Carmel, fully informed of the settlement negotiations and the problems associated with obtaining Cummings' signature. In fact Carmel specifically requested that Spence find out from Cummings what amount he would be willing to accept in return for his signature (Ex.E., p. 59). This is all that Spence did. Under the law he could not accept or commit to accept a settlement proposal on behalf of the bankrupt estate. Any proposed settlement would have to go before the bankruptcy court for acceptance or rejection as the court decided after a hearing to receive input from interested people (there were 908 notices sent out concerning the hearing on the proposed settlement).

In practical effect all Spence did was gather an offer together in a form acceptable to McDonald's and the other signatories, Cummings and the Trustee, so it could be presented to the court for acceptance or rejection. Spencer understood his limitations. Spence testified:

Q You were making no formal offer, you were simply trying to—

A I don't have authority to make an offer, but I have authority I think to gather offers, that's what I think.

(Ex.E, p. 28).

It is apparent from reading the testimony of Spence that he had an extraordinary amount of respect and sympathy for Cummings. It was justified. Cummings had lived with the case and had worked incredibly hard and gone through enormous travail in order to make it succeed. As Spence pointed out, there was no way they could have won the case without him (Ex.F, p. 104). It is difficult in retrospect to fault Spence for refusing to get adversarial with Cummings when settlement negotiations were being conducted under such extraordinary time restraints. It was Spence's judgment at the time and ultimately that of the bankruptcy judge that the settlement figure of $15.5 million should be accepted.

If Spence had, immediately upon learning of Cummings' refusal to sign the agreement on June 18th, informed Horowitz of that fact and that Cummings would have to get an attorney to negotiate for himself, settlement in all probability could not have been accomplished within McDonald's deadline for signing the settlement documents. Remember: Turner was out of the country and his authority had been ratified by McDonald's Board of Directors. Spence in actuality was placed in the position by Turner of that of a claims adjuster. He was given a specific sum of money in order to obtain releases from all claimants. He was to do so under severe time constraints.

As it turned out the estate and the other interested people got the best of both worlds. The settlement documents were executed by the parties, including Cummings, within the deadline imposed by McDonald's, thus preserving the settlement for presentation to the bankruptcy court for approval. A short time later, in court on July 10, 1985, McDonald's unilaterally offered to modify the settlement offer by withdrawing its demand for Cummings' personal release but yet maintaining the entire $15.5 million offer. This offer was

ultimately accepted by the bankruptcy court, bringing to an end a most protracted and difficult piece of litigation. On the other hand, failure to obtain Cummings' release might well have killed the settlement.

The court therefore finds *de novo* that Spence's activities during the week of June 17, 1985 did not constitute a conflict of interest.

The Bankruptcy Code does not compel a different result. The bankruptcy judge adopted the reasoning of the bankruptcy judge in *In re Larry P. Roberts*, 46 B.R. 815 (Bankr.D.Utah), as authority for the standards applied in this case. Although the decision was reversed on appeal to the district court (*In re Roberts*, 75 B.R. 402 (D.Utah 1987)), the principles and rules applied involved conflicts of interest in a closely held corporation in bankruptcy and are not in dispute: they prohibit attorneys for trustees or debtors in possession from acting in conflict of interest. However if there is no conflict of interest there is no violation of any of the rules cited in *Roberts*. 75 B.R. at 413.

The ABA Model Code of Ethics also does not compel a different result. The problem faced by Spence: the negotiation of a settlement requiring the apportionment of an aggregate between multiple claimants is of course a difficult and slippery one. An attorney under Canon 5 of the ABA Model Code (DR 5–106) may participate in the making of an aggregate settlement involving claims of two or more clients only if each consents to the settlement after being advised of the existence and nature of all claims involved in the proposed settlement, of the total amount of the settlement, and of the participation of each person in the settlement. There is no question that both clients, Cummings and the Trustee, consented to Spence's participation in the proposed settlement. The Trustee's attorney specifically instructed Spence to find out what Cummings wanted to settle his claims. It was not necessary that the clients consent to the making of the settlement because neither Spence nor the clients had power to conclude a settlement. It would appear therefore that Spence was not in violation of Canon 5. Canon 7 and Canon 9 require that a lawyer represent a client zealously within the bounds of the law and that he avoid the appearance of impropriety. Nothing in the Facts of this case indicate a violation of these Canons either.

Accordingly, the court finds that under the particular facts of this case the bankruptcy judge's Conclusion of Law that Special Litigation Counsel acted in conflict of interest was erroneous and is reversed and vacated, along with the compensatory and punitive sanctions of $142,684.92. Since this resolves the issues raised in No. 85 C 10073 the court need not decide the remaining questions raised by appellants.

█ The sole issue in No. 86 C 1831 is whether the bankruptcy judge properly refused to approve interest that the firm of Becker & Tenebaum paid on money it borrowed to pay litigation costs when litigation expense money borrowed by the estate was not forthcoming. The loans were not authorized on behalf of the estate.[6]

The interest expense was disallowed by the bankruptcy judge because he felt that money used to pay litigation costs was "normal overhead expenses" of a litigation firm. *In re Central* at p. 494.

However the retainer agreement that the bankruptcy court approved requires the client to reimburse the attorneys for litigation expenses as they were received (Ex.A). The interest expense was obviously incurred by Becker & Tenenbaum because the client did not reimburse the attorneys promptly. Accordingly, the court finds that the interest expense incurred by Becker & Tenenbaum in the amount of $14,807.19 should have been allowed.

## CONCLUSION

In Case No. 85 C 10073, the Conclusion of Law finding Special Litigation Counsel

---

6. No one having standing has agreed to uphold the bankruptcy judge's ruling in No. 86 C 1831.

No *amicus* sought to file a brief either.

in conflict of interest is reversed and the monetary sanction in the amount of $142,-684.92 is vacated.

In Case No. 86 C 1831 the disallowance of the $14,807.19 interest expense is reversed and is hereby allowed.

IT IS SO ORDERED.