**In re BTS, INC., p/k/a Aviation Resources, Inc., Debtor.**

**Bankruptcy No. 95–01473–M.**

United States Bankruptcy Court, N.D. Oklahoma.

April 7, 2000.

---

Darrell Williams, Tulsa, OK, for Debtor.

Charles Greenough, Tulsa, OK, for Valley National Bank.

Kevin Doyle, Tulsa, OK, for First National Bank of Broken Arrow.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL, Chief Judge.

THIS MATTER comes before the Court for consideration of the Motion to Convert filed by Valley National Bank ("Valley") and the Amended Motion for Dismissal filed by BTS, Inc., p/k/a Aviation Resources, Inc. ("BTS" or "Debtor"), Debtor herein. An evidentiary hearing with respect to both motions was held on January 6, 2000. Debtor appeared through its attorney, Darrell E. Williams. Valley appeared through its attorney, Charles Greenough. Also appearing were Kevin P. Doyle on behalf of the First National Bank of Broken Arrow ("FNBBA") and Paul Thomas from the Office of the Assistant United States Trustee. At the conclusion of the evidentiary hearing, the parties requested leave of the Court to submit post-hearing briefs. The Court granted the parties' request, and a briefing schedule was established, with the last brief being received on March 6, 2000. The following findings of fact and conclusions of law are made pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52, which are made applicable to this contested matter by Bankruptcy Rule 9014.

### Jurisdiction

The Court has jurisdiction over these contested matters pursuant to 28 U.S.C.A. § 1334(b) (West 2000).[1] Reference to the

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.* (West 2000).

Court of these contested matters is proper pursuant to 28 U.S.C.A. § 157(a) (West 2000). These contested matters constitute core proceedings as contemplated by 28 U.S.C.A. § 157(b)(2)(A) (West 2000).

### Burden of Proof

■ Valley, as the moving party with respect to the Motion to Convert, has the burden of proof "as to all elements of the statutory provisions on which [it] relies." *See In re Minnesota Alpha Foundation,* 122 B.R. 89, 91 (Bankr.D.Minn.1990) (citation omitted); *see also In re Citi–Toledo Partners,* 170 B.R. 602, 606 (Bankr. N.D.Ohio 1994). BTS faces the same burden with respect to its request for dismissal.

### Findings of Fact

BTS is an Oklahoma corporation. George W. Moody ("Mr.Moody") is the President and Chief Operating Officer of BTS. On May 18, 1995, BTS filed a petition for relief under Chapter 11 of the Bankruptcy Code. According to the disclosure statement filed on March 8, 1999, "[t]he primary business activity of Debtor is the provision of services to the airline crew training industry and the manufacture, relocation and upgrade of training devices used in the airline crew training industry." *See Debtor's Exhibit 1,* pp. 6—7. The principal events that have brought the parties and the Court to this point may be summarized as follows:

*The Dispute Between BTS and Valley*

Valley was BTS' principal lender between 1986 and 1992. Thereafter, the relationship between BTS and Valley soured. An action (the "State Court Action") was filed by Valley against BTS and others in the District Court in and for Tulsa County, Oklahoma in July of 1994. In the State Court Action, Valley sought to collect the amounts it claims are owed to it and to recover its collateral. In response, BTS and the other defendants filed a counterclaim seeking to recover in excess of $10,-000,000.00 from Valley under various theories (the "lender liability claim").[2] At the January 6, 2000, trial of these contested matters, Mr. Moody valued the Debtor's claims against Valley at "many times more than" $1,700,000.00, which is the value placed upon the lender liability claim upon the books and records of BTS. *See Transcript of Proceedings held January 6, 2000,* p. 41, lines 3—13 (hereafter *"Transcript"*). The lender liability claim appears to be the major asset of the Debtor. According to Mr. Moody, BTS has no tangible personal property which is not pledged to FNBBA.

*Other Assets*

With respect to other assets of BTS, the monthly operating reports list the sum of $423,587.00 as "due from insiders." Upon examination, Mr. Moody admitted that this sum was owed by him to BTS; however, Mr. Moody also alleged that this debt is "conditional," and that he does not owe any money to BTS unless and until BTS prevails in its claims against Valley. Although the debt has been listed on virtually all of the monthly operating reports filed in this case, the "conditional" nature of the liability was not disclosed until Debtor filed its sixth plan and disclosure statement in March of 1999.[3] Upon inquiry by counsel for Valley as to why the

---

**2.** On January 30, 1996, this Court entered an order modifying the provision of the automatic stay in order to allow the litigation between BTS and Valley to proceed in state court. *See Docket No. 140.* Although the State Court Action has been pending for almost six years, it has yet to proceed to trial.

**3.** The sixth disclosure statement contained the following provision regarding Mr. Moody's obligations to BTS:

The MORs [monthly operating reports] include a line item Due From Insiders of $423,587. This entry stems from an agreement in 1994 between Debtor and an officer, George W. Moody, which concerns a loss sustained by the Debtor as a result of a real estate transaction. This amount is contingent and becomes due and collectible only upon the successful prosecution of the Valley Litigation.
*See Valley Exhibit 95,* p. 29.

contingent nature of this obligation was not disclosed prior to March of 1999, Mr. Moody responded, "I was never asked." In addition, Mr. Moody stated that it was his decision, as the chief operating officer of BTS, to consider this personal obligation as contingent in nature.

Valley claims that the assets of BTS include the sum of approximately $94,-000.00 which may be recovered from an entity known as Aviation Resources Group, Inc. ("ARG"). ARG is a corporation which apparently had been engaged in business with BTS. The most recent disclosure statement contains the following description of the relationship between BTS and ARG:

> Between 1994 and 1996 Debtor secured prime contracts which were executed through the sub contract [sic] of manufacturing and engineering services to Aviation Resources Group, Inc. (hereinafter "ARG"). Valley's action against ARG in May of 1996 resulted in the cancellation of those contracts. ARG ceased to be willing to undertake sub contract [sic] business from BTS and ceased operation shortly thereafter.

See Valley Exhibit 95, p. 17. The relationship between the principals of BTS and ARG remains a bit of a mystery to the Court. Mr. Moody admitted being involved in the formation of ARG sometime in 1994, although he testified that he was not in control of ARG at any time while the bankruptcy case of BTS was pending.[4] In the year prior to the filing of the bankruptcy case, BTS paid ARG the sum of $94,000.00.

After reviewing the relationship between ARG and BTS, Valley believed that these payments were preferential and requested that BTS seek their recovery. BTS, at the direction of Mr. Moody, its chief operating officer, made the decision not to do so. Valley then petitioned this Court for per-

mission to bring the preference action in the name of the estate or, in the alternative, for the appointment of an examiner for the limited purpose of prosecuting an action against ARG. In an order dated July 31, 1996, this Court denied Valley's motion without prejudice "upon a change of conditions." See Debtor's Exhibit 9.

Valley has also alleged that certain postpetition transfers by BTS to ARG may have been improper. Valley notes that in October and November of 1995, BTS paid the total sum of $38,000.00 to ARG. See Valley Exhibits 6 and 7. When questioned about the services performed by ARG to earn this $38,000.00, Mr. Moody answered in generalities, referring to an "administrative services agreement" and stating that ARG performed "engineering" and "program management" tasks. See Transcript, p. 81, line 24 through p. 82, line 20. The Court, after hearing Mr. Moody's testimony, has no more idea as to what specific tasks ARG performed for the benefit of BTS than it did before.

*Post–Petition Business Activity*

Debtor has maintained a minimal level of business activity since the filing of this case. According to the most recent disclosure statement, BTS had sales of $147,-908.00 in 1996, $50,680.00 in 1997, and $46,491.00 in 1998. The monthly operating reports filed in this case present an even bleaker picture of the Debtor's revenue generation. Although the operating reports indicate $334,079.00 of gross revenue between May of 1995 and June of 1999, actual cash received by the Debtor during this period was only $113,149.00. See Valley Exhibit 52. Not all of the revenue was attributable to business activity. For example, the gross revenue of BTS in September of 1995 included "non-operating receipts" of $28,645.00. See Valley Exhibit

---

4. The Court notes with some interest that at some time prior to the filing of the bankruptcy case, BTS changed its corporate name from Aviation Resources, Inc., to BTS, Inc.

Thereafter, Aviation Resources Group, Inc. was formed, with the involvement of certain of the principals of BTS, including Mr. Moody. See Valley Exhibit 77.

5. According to the testimony of Mr. Moody, these monies may have been proceeds from an insurance policy.[5]

*Creditors*

According to the most recent disclosure statement, BTS has the following remaining creditors:

| Class | Description | Allowed Amount |
|---|---|---|
| 1. | Administrative Claims | $ 159,262.87 |
| 2. | Secured Creditor—FNBBA | 460,000.00 |
| 3. | Priority Unsecured Creditors | 50,443.16 |
| 4. | Unsecured Creditors—Non-insiders | 780,669.90 |
| | TOTAL CREDITORS: | $1,450,375.93 |

---

*See Valley Exhibit 95,* p. 26. The claims of certain other pre-petition creditors have been resolved by agreement during the pendency of this Chapter 11 case. It appears to the Court that if BTS has accurately valued its lender liability claim against Valley, said claim has the potential to fully satisfy all creditors of BTS.

*The Internal Revenue Service*

The disclosure statement filed by BTS on December 19, 1995, contained the following statement regarding the United States of America, acting through the Internal Revenue Service (the "IRS"):

> Debtor owes approximately $117,246.29 to the Internal Revenue Service (hereafter the "Service") and the Oklahoma Tax Authority. These claims are entitled to priority status under 11 U.S.C. § 507. A proof of claim considerably in excess

of the sum above has been submitted by the Service which is currently being evaluated. There are also some other concerns regarding the actions of the Service, which hopefully can be resolved between the parties without impact to Debtor's Plan or recourse to the Court.

*See Valley Exhibit 85,* p. 22. Shortly thereafter, on February 26, 1996, BTS filed an amended disclosure statement in which it affirmatively stated that it did "not believe that it [had] a claim against the Internal Revenue Service." *See Valley Exhibit 85,* p. 25, n. 35. The determination that BTS had no claim against the IRS was made by Mr. Moody in his capacity as the chief operating officer of Debtor. *See Transcript,* p. 103, lines 8—13.

Although Mr. Moody did not believe that BTS held any sort of claim against the IRS, he felt differently about his personal

**5.** The monthly operating reports include the following information:

| Time Period | Gross Revenues | Cash Sales | Collection of Accounts Receivable | Non–Operating Receipts |
|---|---|---|---|---|
| 1995 *: | $ 80,150.00 | $ 400.00 | 20,640.00 | $32,056.00 |
| 1996: | $148,158.00 | $13,545.00 | $ 0.00 | $ 1,533.00 |
| 1997: | $ 49,630.00 | $ 0.00 | $10,850.00 | $ 1,058.00 |
| 1998: | $ 46,491.00 | $ 0.00 | $26,488.00 | $ 18.00 |
| 1999 **: | $ 9,650.00 | $ 0.00 | $ 2,500.00 | $ 0.00 |

*—May through December

* *—January through June

These numbers are a bit puzzling, especially in light of Mr. Moody's testimony that BTS went on a "cash basis" with its customers as a result of certain alleged conduct by Valley.

situation. On August 13, 1999, in an action pending in the United States District Court for the Northern District of Oklahoma captioned "George W. Moody, Plaintiff, vs. the United States of America, Defendant," and docketed as Case No. 98–C–259–H (the "IRS Action"), Mr. Moody filed a verified amended complaint (the "Complaint") in which he alleged that the IRS owed him not less than $874,732.12 in damages. *See Valley Exhibit 83.* The factual allegations in the Complaint center around the collection of payroll taxes owed by BTS, and the breach of an agreement between BTS and the IRS for the payment of those taxes. In response to a motion for summary judgment filed by the IRS, Mr. Moody filed a declaration under penalty of perjury which included the following statements:

14. On May 18, 1995 BTS was forced to file for protection from its creditors under chapter 11 of the U.S. Bankruptcy Code in part due to the additional pressures placed upon the parties by the IRS. That case is pending. At the time of its petition BTS owed the IRS approximately $100,000 but the trust fund portion of the obligation had been fully paid by virtue of BTS' August 3, 1994 designation. The IRS further failed to credit Plaintiff's account for the trust fund payments made by BTS and continued to increase the alleged indebtedness of Plaintiff with increasingly aggressive collection activities until the demand reached $410,316.43, see Exhibit G, at which point Plaintiff was forced to file this action.

. . . .

*Through these unauthorized collection activities, spanning a 6 year period, the IRS collected a mere $18,445.89, or less than one monthly corporate payment, but in the process contributed greatly to the demise of BTS, thus killing the goose that laid the golden eggs.*

*See Valley Exhibit 76,* pp. 7 and 9 (emphasis added). Notwithstanding these statements, BTS is not a party to the IRS Action, nor is BTS currently seeking any relief from the IRS.

*Reorganization Efforts*

BTS has filed six separate plans and disclosure statements in this bankruptcy case. In each instance, objections to the disclosure statement were filed, and the disclosure statements were not approved. The last such plan and disclosure statement were filed on March 8, 1999. Under the terms of said plan, the existing shareholders of the Debtor would have retained their equity interest in the Debtor in exchange for a cash infusion of $50,000.00. Valley objected to this disclosure statement. On April 27, 1999, this Court issued its bench ruling denying approval of the disclosure statement. *See Docket No. 354M.* In its bench ruling, the Court found that the sixth plan proposed by BTS was not confirmable as a matter of law, and that the disclosure statement did not contain adequate information as that term is defined under § 1125(a). This ruling was not appealed.

*The Attempts by BTS to Employ Special Counsel*

On April 15, 1999, BTS filed an application (the "Application") to employ the firm of Richardson & Ward ("R & W") for the purpose of prosecuting the State Court Action. *See Docket No. 346.* Under the terms of the Application, R & W was to be paid a contingent fee of fifty per cent (50%) of all sums recovered in the action against Valley. In addition, under the terms of the Application, R & W would be entitled to reimbursement of expenses without the approval of this Court. A hearing was held on the Application on April 27, 1999. At that hearing, the Court noted that if it were to approve the Application as filed, it would be precluded from further review of the contingency fee, and denied the Application without prejudice. *See Docket No. 354M.* On June 16, 1999, BTS filed its amended application to employ R & W as special counsel (the "Amended Application"). *See Docket No.*

*370.* On June 21, 1999, this Court entered its order denying the Amended Application. *See Docket No. 371.*[6]

*Procedural History*

On August 6, 1999, BTS filed its original Motion to Dismiss this bankruptcy case (the "First Motion"). *See Docket No. 379.* The basis for dismissal outlined in the First Motion was that BTS required the services of R & W in the State Court Action and that R & W was unwilling or unable to comply with the requirements of the Bankruptcy Code with respect to their employment.[7] In the First Motion, BTS sought to shorten the notice given to all creditors and parties in interest. Valley objected to the shortening of notice. *See Docket No. 380.* On August 9, 1999, in apparent response to the objection by Val-

ley, BTS filed its Amended Motion for Dismissal (the "Amended Motion"). *See Docket No. 381.* The Amended Motion removed the request that notice be shortened, but was otherwise identical to the First Motion.

On September 7, 1999, BTS filed a supplement to the Amended Motion, arguing that dismissal was in the best interest of creditors and the estate because: (1) BTS has settled all of the disputes that can be settled while a Chapter 11 debtor; (2) as a result of its relationship with Valley, BTS is unable to reorganize; (3) the successful prosecution of the lender liability claims against Valley is essential to the future of BTS; and (4) all of the creditors of the estate (with the exception of Valley) would be benefitted by dismissal. Mr. Moody testified in support of these allegations at

6. The order denying the Amended Application contained a detailed explanation of the reasoning behind the denial of the Application. Said reasoning will not be repeated herein.

7. The operative allegations of the First Motion are as follows:

Debtor, BTS Inc., pursuant to Title 11, Section 1112(b), hereby requests that the Court dismiss Debtor's Chapter 11 reorganization bankruptcy proceeding for cause and reasons which are in the best interest of creditors and the estate. In support of its Motion for Dismissal, Debtor would state the following:

1. That it would be in the best interest of Debtor's estate and all creditors for Debtor to proceed with its Counterclaim litigation against Creditor, Valley National Bank. Debtor anticipates recovering on its Counterclaims and a substantial amount of money would be available for the benefit of its creditors. If Debtor is successful, all of the creditors will likely be paid in full.

2. Debtor has made Application for Appointment of Special Counsel, however, the Bankruptcy Court has denied the approval and appointment of the special counsel under the terms and conditions requested by Debtor. This Court has stated in its Order denying Debtor's Amended Application to Employ Special Counsel that bankruptcy case law requires that the Court review the reasonableness of attorney fees incurred for the benefit of the Debtor. Debtor appreciates the careful scrutiny of the Bankruptcy Court,

however, Debtor believes that this case is unique and requires a novel approach for the contingency fee agreement to be approved.

3. To emphasize the complexity and extensive nature of the litigation, the Final Witness and Exhibit Lists propounded by Valley National Bank includes 59 witnesses and 477 exhibits. The current Docket Sheet and the appeals perfected by Valley further support the litigious nature of Valley National Bank over the last four years.

4. Because it is imperative for Debtor to proceed with the Richardson & Ward law firm, it now becomes incumbent upon the Debtor to request the Court to dismiss the bankruptcy proceedings so that it can retain the Richardson & Ward firm to represent its interests and protect both the interests of the Debtor and its creditors.

5. The Pretrial of Debtor's State Court action is set for September 1, 1999. Debtor requests that this matter be set for expedited hearing and that notice be limited to those persons listed on the Certificate of Mailing attached hereto.

WHEREFORE, premises considered, Debtor requests this Court to set this matter for expedited hearing and limit notice to those persons listed on the Certificate of Mailing attached hereto, enter its order of Dismissal of the Chapter 11 proceedings filed herein, and grant the Debtor such further relief as this Court would deem equitable and proper.

the January 6, 2000, hearing.[8]

Valley filed the Motion to Convert which is currently before the Court on November 23, 1998. After reviewing said motion, the Court provided BTS with an opportunity to propose a plan and disclosure statement and deferred taking any action with respect to the issue of conversion until the process of consideration of said plan and disclosure statement had run its course. Consideration of the issue of conversion was further delayed while Valley and BTS explored the possibility of settlement of their dispute.[9] By agreement of the parties, the Motion to Convert and the Motion to Dismiss were heard concurrently.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Conclusions of Law

BTS freely admits that it does not have the ability to propose a confirmable Chapter 11 plan. This admission is borne out by its track record in this case: six separate plans and disclosure statements have been proposed, and no plan has been confirmed. After review of the last plan and disclosure statement (proposed in March of 1999), this Court concluded that the same was not confirmable as a matter of law. The question is not whether cause exists to convert or dismiss this case; it does. The question is which is more appropriate: conversion or dismissal. For the reasons set forth below, the Court declines to dismiss this case, and orders its conversion to a case under Chapter 7 of the Bankruptcy Code.

▉ Section 1112(b)(2) reads in pertinent part as follows:

[o]n request of a party in interest or the United States Trustee or a bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

. . .

(2) inability to effectuate a plan . . . .

*See* § 1112(b)(2). The United States Court of Appeals for the Fourth Circuit has held that

A motion filed under this section invokes a two-step analysis, first to determine whether "cause" exists either to dismiss or to convert the Chapter 11 proceeding

---

**8.** A portion of the testimony of Mr. Moody on the issue was as follows:

Q. Mr. Moody, would you, as the president of the company, give the court your bottom line in regard to why you are seeking a dismissal again? Would you give the court your opinion as to why dismissal is in the best interest [sic] of BTS at this time?

A. The—with—the relationship between debtor and Valley is such that we will not be able to reorganize. We continue to spend a considerable amount of money in litigation in this court which therefore has little purpose given the relationship between Valley and debtor. Secondly, we cannot operate our business given this relationship. The task of prosecuting the state court action is very large and we need all the help we can get for that. So we would like to execute a contract that we have contemplated with Richardson & Ward which relieves us of the financial burden and a significant amount of the work. Eliminating the interference enables the business to increase by a factor of five which helps all of us.

As to dismissal versus conversion, we don't believe that—obviously, the business will not proceed, number one. We won't be able to do what we would like to do relative to the state court action. Well then maybe a trustee would, but we have no—I can't say anything about that. But the biggest thing is that we won't be able to utilize the assets of the corporation such as they are. Therefore, dismissal is in the best interests of creditors and conversion is not.

*Transcript,* p. 48, line 18 through p. 49, line 19.

**9.** The efforts made at settlement included a settlement conference before the Honorable Frank McCarthy, United States Magistrate Judge for the Northern District of Oklahoma. Notwithstanding the efforts of all involved, the parties were unable to reach a settlement.

to a Chapter 7 proceeding, and second to determine which option is in "the best interest of creditors and the estate." *See In re Mechanical Maintenance, Inc.*, 128 B.R. 382, 386 (E.D.Pa.1991). Once "cause" is established, a court is required to consider this second question of whether to dismiss or convert. *See In re Finney*, 992 F.2d 43, 45 (4th Cir.1993).

*See Rollex Corporation v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 242 (4th Cir. 1994) (hereafter *"Superior Siding"*). Once cause has been shown,

> [t]he standard for choosing conversion or dismissal based on "the best interest of creditors and the estate" implies a balancing test to be applied through case-by-case analysis. In the end, the determination is a matter for sound judicial discretion.

*See In re Staff Investment Co.*, 146 B.R. 256, 260 (Bankr.E.D.Cal.1992) (citation omitted); *see also Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir.1989) ("The bankruptcy court has broad discretion under § 1112(b).") (citations omitted); *see also In re Lumber Exchange Building Limited Partnership*, 968 F.2d 647, 648 (8th Cir. 1992) (and cases cited therein); *see also In re Federal Roofing Co., Inc.*, 205 B.R. 638, 641 (Bankr.N.D.Ala.1996) ("Courts have wide latitude in determining whether cause exists to convert or dismiss.") (citation omitted).

■ BTS argues that dismissal is in the best interest of creditors for a variety of reasons, the main reason being that dismissal would allow BTS to focus on its state court litigation with Valley. This reasoning is based upon two separate premises offered by BTS: (1) dismissal would allow BTS to retain R & W as its counsel in the litigation against Valley; and (2) the value of the litigation against Valley is drastically impaired if Mr. Moody does not remain in control of BTS (and thus, in control of the litigation).[10] Three creditors, including FNBBA, have filed pleadings and/or testified in support of Debtor. Valley argues that conversion is in the best interest of creditors, as it would result in the appointment of an independent trustee to examine all of the assets of the Debtor, including the potential preference claims against ARG, the sums owed to the Debtor by Mr. Moody as well as the claims against Valley. The Assistant United States Trustee for this district supports the position taken by Valley.

The Court concludes that BTS has no real ongoing business activities. Debtor's revenues are minimal; a significant portion are described by Debtor as "non-operating revenues." The actual income of the Debtor is far less than the amount of gross revenues identified in the monthly operating reports. Although Mr. Moody testified that the Debtor engages in consulting activities, such activities appear to generate little or no income. The Court also sees no factual basis for Mr. Moody's statement that, upon dismissal of this bankruptcy case, the Debtor's revenues will increase fivefold. Mr. Moody testified that the major cause of Debtor's reduced revenues was its adversarial relationship with Valley. Dismissal of this case will not change the nature of that relationship.

Valley has identified four potential sources of monetary recovery for BTS:

1. the lender liability claims against Valley;

2. the $423,000.00 owed to BTS by Mr. Moody;

3. the $94,000.00 paid to ARG by BTS in the year prior to bankruptcy; and

4. the potential of a claim against the IRS.

The evidence before the Court indicates that each of the claims is, at a minimum, colorable and worthy of further investigation. The question is whether these claims

---

**10.** Debtor has gone so far as to suggest an order of dismissal which requires BTS to use proceeds from its litigation with Valley to pay its pre-petition creditors.

should be investigated and, if appropriate, prosecuted by a bankruptcy trustee under the auspices of this Court or whether the same should be left to BTS and its chief operating officer, Mr. Moody.[11]

At least two of the claims (the $423,000.00 and the monies paid to ARG) appear to directly involve Mr. Moody.[12] With respect to the lender liability claims against Valley, Mr. Moody takes the position that, in addition to the claims held by BTS, he has his own direct claims against Valley as well.[13] Notwithstanding his allegations in the IRS action that the conduct of the IRS "killed the goose that laid the golden egg" (i.e., BTS), Mr. Moody, as the chief operating officer of BTS, has determined that BTS has no claim against the IRS. It is possible that the personal interests of Mr. Moody are or may become at odds with the interests of BTS. In such a situation, conversion is appropriate. As one court has noted,

> Upon making this conclusion [that conversion or dismissal is warranted], the Court then must determine which alternative is in the best interests of creditors and the estate, as between conversion and dismissal. 11 U.S.C. § 1112(b). In the ordinary case, the facts would support a conversion of this case to Chapter 7, with the concomitant appointment of a trustee. At present, *the major assets of the estate are causes of action which must be fixed and liquidated to be of any value. Generally speaking, it is in the best interests of creditors to have this done by a disinterested trustee, so the merits of the debtor's third-party claims can be evaluated dispassionately, and so the fruits of a successful litigation can be preserved for ratable distribution.*

*See In re Minnesota Alpha Foundation, supra,* 122 B.R. at 95 (emphasis added).[14] In addition, if the bankruptcy case is dismissed, any preferential claims which may exist will be lost. This factor warrants in favor of conversion. *See In re Citi–Toledo Partners, supra,* 170 B.R. at 609 (preservation of avoidance powers "strongly favors conversion" of case). The Court also considers it doubtful that Mr. Moody will take an objective view of whether BTS should pursue him for $423,000.00, or whether the Debtor has a stake in the claims which he has personally made against the IRS. This factor also favors conversion over dismissal. *See In re Natrl Plants and Lands Management Co., Ltd.,* 68 B.R. 394, 396 (Bankr.S.D.N.Y.1986) (chapter 11 case converted to chapter 7 where court finds question as to whether debtor would be "impartially motivated" to investigate potentially avoidable transfers made to affiliates of debtor).

BTS, as well as the creditors who support dismissal of this case, argue that much of the value of the State Court Action will be lost if this case is converted. The Court respectfully disagrees. The

---

11. At the evidentiary hearing on this matter, and in its post-trial brief, Valley contends that both Mr. Moody and his counsel have engaged in inequitable and improper conduct which in and of itself justifies conversion of this case. The Court need not reach those issues in order to issue its ruling, and does not purport to do so in any way, except to note that one of the cases cited by Valley in support of its position has been reversed. *See In re Central Ice Cream Company,* 59 B.R. 476 (Bankr.N.D.Ill.1985), *rev'd* 114 B.R. 956 (N.D.Ill.1989) (cited by Valley at p. 14 of its post-trial brief).

12. The $423,000.00 claim is a direct claim against Mr. Moody. Although Mr. Moody testified that he was not in control of ARG, BTS and ARG did operate out of the same business location, and it appears that Mr. Moody's wife had some involvement in the operations of ARG.

13. Counterclaims against Valley have been filed by BTS, George W. Moody Investments, Inc., an Oklahoma corporation, George W. Moody, individually and Eva L. Moody, individually. *See Debtor's Exhibit 3,* p. 9.

14. The Court acknowledges that this quotation is dicta, as the debtor in *Minnesota Alpha* was of such a nature that its case could not be involuntarily converted to a case under Chapter 7. *See id.*

Chapter 7 Trustees in this district have experience with and are qualified to administer substantial pieces of litigation. There is nothing to indicate that a trustee cannot properly assess the claims made by BTS against Valley and pursue them accordingly. To the extent work in the State Court Action has been undertaken, the fruits of that labor should be available to the trustee appointed in this case. Although BTS has valued its claim against Valley at approximately $1,700,000.00, Mr. Moody testified that the claim is worth far more. If he is correct, not only will the claim result in the payment of all creditors in this case, but significant monies would be available for distribution to the holder of the equity interests in BTS, who are "members of the George W. and Eva L. Moody family individually and family trusts." *See Debtor's Exhibit 1*, p. 6. Under this scenario, the Court sees no reason why Mr. Moody would not be sufficiently motivated to assist a trustee in the proper prosecution of the Debtor's claims against Valley.

 BTS argues that the fact that three creditors have indicated their support for dismissal while only one supports conversion mandates the conclusion that the Court dismiss this case. This Court disagrees. In determining whether to convert or dismiss a case, this Court is to make a determination as to what is in "the best interests of creditors and the estate," and not to act as a mere counter of votes. *See Superior Siding, supra,* 14 F.3d at 243 (best interests of creditors test "not served by merely tallying the votes of the unsecured creditors and yielding to the majority interest").

Finally, the Court finds that the main reason BTS seeks dismissal of this case is in order to employ R & W in the State Court Action. This was the primary basis for dismissal pled in both the First Motion and the Amended Motion. Mr. Moody testified that the desire to employ R & W was a major factor in the decision to seek dismissal. There can be little doubt that if the Court had approved the retention of R & W upon the conditions demanded by R & W, BTS would have no interest in the dismissal of this case. The unwillingness of potential counsel to abide by the operative provisions of the Bankruptcy Code regarding their right to compensation is not cause for dismissal of a bankruptcy case.

## Conclusion

The Motion to Convert filed by Valley National Bank is granted. This case is hereby converted to a case under Chapter 7 of the Bankruptcy Code. The Amended Motion for Dismissal filed by BTS is denied.